**UNITED STATES of America, Appellee,**

v.

**Edward F. McDONOUGH, Jr., Defendant–Appellant.**

**No. 1306, Docket 94–1397.**

United States Court of Appeals, Second Circuit.

Argued April 13, 1995.

Decided May 24, 1995.

William J. Dreyer, Albany, NY (Dreyer, Boyajian & Tuttle, Jill A. Dunn, of counsel), for defendant-appellant.

David R. Homer, Asst. U.S. Atty. for N.D.N.Y. (Thomas J. Maroney, U.S. Atty., Henry M. Greenburg, Asst. U.S. Atty., of counsel), for appellee.

Before: FEINBERG, VAN GRAAFEILAND and KEARSE, Circuit Judges.

FEINBERG, Circuit Judge:

Defendant Edward F. McDonough, Jr. appeals from a judgment of conviction entered in July 1994, following a widely publicized jury trial in the United States District Court for the Northern District of New York, Thomas J. McAvoy, Chief Judge. Defendant and his wife, Marion McDonough, were charged in a 14–count indictment with mail fraud, extortion, racketeering and conspiracy in connection with an alleged scheme to use Edward McDonough's position as Chairman of the Rensselaer County Democratic Committee (the Committee) to obtain kickbacks on insurance commissions paid by various public entities.

Following a five-week trial, the jury found Edward McDonough (hereafter referred to as McDonough or defendant) guilty on five counts including two counts of extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. §§ 1951 & 2, and one count each of mail fraud in violation of 18 U.S.C. § 1341, racketeering in violation of 18 U.S.C. § 1962(c) and conspiracy to commit extortion in violation of 18 U.S.C. § 1951. McDonough was acquitted on one count, and the jury was unable to reach a verdict as to the remaining counts. Marion McDonough was found not guilty on seven counts, and the jury was undecided as to the rest. On the government's motion, the district court dismissed without prejudice all of the undecided counts.

McDonough was sentenced to 51 months in prison to be followed by two years of supervised release. He was ordered to make restitution of more than $500,000. McDonough is presently incarcerated. We affirm.

## I. Background

### A. Government's Case

From the evidence before it, the jury could have found the following. During a 13–year period, McDonough abused his office in exchange for more than $500,000 of kickbacks on insurance commissions generated from the Town of Brunswick and Rensselaer County. The government introduced evidence that McDonough served as Committee chair from 1968 to 1993. During his tenure, he was also self-employed as an insurance agent specializing in personal and small business insurance. From 1969 to 1991, McDonough was also employed by the New York State Assembly in Albany.

In 1978, after a substantial period in Republican hands, the governing bodies of several towns in Rensselaer County, including the Town of Brunswick, came under Democratic Party control. In 1986, the Democrats also won majority status in the Rensselaer County legislature after a four-year period of Republican control.

According to the government, McDonough took advantage of these victories and used his position as Committee chair to influence the newly Democratic town and county to retain the insurance services of his longtime friends, John M. O'Connor and Donald Petro. The O'Connor Agency wrote insurance policies for the Town of Brunswick from 1978 to 1992, during which period it kicked back to McDonough nearly $100,000, half of the commissions on that account. Petro's agency, the R.J. Carignan Agency, similarly kicked back almost $500,000 from 1986 to 1993, representing 50% of the commissions it received on insurance policies for Rensselaer County. Petro paid these kickbacks to the Collar City Agency, Inc. (Collar City), a corporation formed in April 1986, which was based in the McDonoughs' home. Marion McDonough

was the sole shareholder, but the government presented evidence that McDonough himself actively participated in the affairs of the corporation and benefitted from the kickbacks paid to it.

## B. Trial Publicity

Not surprisingly, the trial received considerable publicity in the local press. Several news stories disseminated during the trial were highly critical of the defendant. For example, on January 30, 1994, the day before McDonough was to begin testifying, the Sunday Times Union of Albany published an article entitled "Testimony Carries No Insurance" by columnist Fred LeBrun. The column discussed the prospect of McDonough's testifying, stating that McDonough "could get eaten alive" by the prosecution if he testified. It described McDonough as "thin-skinned, irascible, [and] historically arrogant." The article also said that "[t]his trial is not going [the defendants'] way" and "veteran courtroom observers give the fight so far convincingly to the prosecution." The district court described the article as "poisonous."

The day after this article appeared, upon defendant's request, the district court inquired into the potentially prejudicial impact of this article on the jurors by examining each juror outside the presence of the others. Of three jurors who admitted having seen the article, two stated that they had not read it, and the third, Juror No. 4, stated that he had begun to read it but stopped when he realized that it was about the trial. In response to the court's question of whether the article had influenced him in any way, Juror No. 4 answered, "No. I just noticed what it was about and that was it."

Four additional jurors, including the alternate, were aware of the existence of the article but said that they had not seen it. One said that she was aware of the "editorial," as her mother had described it, but that she had not read it or discussed it. Two jurors stated that they had heard other jurors talking about the article that morning after the court began its questioning. Finally, the alternate juror said that although she had not seen the article, she had heard some-

one mention it that morning, but she could not recall hearing anything about its content. The remaining six jurors stated that they had neither seen nor heard about the article.

After the court reported the results of the inquiry to the attorneys, defendant moved for a mistrial. The court denied the motion on the ground that all of the jurors "indicated to a person that they don't know about the content of this article from either other sources or from reading it."

A few hours later, the alternate juror approached the trial judge ex parte during a break in testimony. Part of the conversation was unrecorded. According to the judge's subsequent report to the parties, the juror expanded on her earlier response to the court's question, stating that while she was changing her shoes in the jury room that morning, someone had mentioned seeing the LeBrun article over the weekend while flipping through the newspaper. In response to the judge's question of whether she had heard anything about the content of the article, she said, "Nobody saw anything. I think somebody flipped through it and saw it when they were flipping through the pages. That's what I was trying to say." The court also reported to the attorneys that the alternate juror said she was concerned about her "integrity," and wanted "to be truthful, not like him." The court interpreted this comment as referring to the defendant, and described the alternate juror's demeanor as "very emotional" and "babbling."

The defense then renewed its motion for a mistrial and requested further inquiry of the alternate juror regarding, among other things, the identity of the person who had not been truthful. The alternate juror was ultimately excused without deliberating. After the jury rendered its verdict, the defense moved for permission to interview the alternate juror. That request was denied. *United States v. McDonough*, 844 F.Supp. 115 (N.D.N.Y.1994). A subsequent defense motion to question three jurors who had participated in deliberations was also denied.

On February 16, 1994, the eighth day of jury deliberations, the court reported to the attorneys another possible incident of jury

contact with trial publicity: after the court clerk informed the jurors that they would be called back into open court, someone in the jury room said substantially, "I guess that means the Judge is going to be giving an *Allen* rule." That morning, the Albany Times Union had printed an article referring to the possibility that the court might give an *Allen* charge that day due to the length of jury deliberations. See *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Neither of the attorneys requested that the court question the jurors about this comment.

## II.  Discussion

### A.  Trial Publicity

McDonough argues that due to juror contact with trial publicity, he was deprived of his Sixth Amendment right to a fair and impartial jury. A district court's decision regarding juror impartiality is reviewed for abuse of discretion and deserves deference. *United States v. Gaggi,* 811 F.2d 47, 51 (2d Cir.), cert. denied, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); cf. *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (per curiam) (habeas petition by state defendant).

### 1.  The LeBrun article

■ McDonough argues that the district court abused its discretion in failing to ascertain how much each juror knew of the January 30, 1994 Times Union column by Fred LeBrun or to assess whether jurors exposed to the article could remain impartial. McDonough and the government agree that the district court is required to follow the three-step process we set forth in *Gaggi* when inquiring into the effects of trial publicity on jurors. The steps are:

> first, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors—outside the presence of the other jurors—to ascertain how much they know of the distracting publicity and

what effect, if any, it has had on that juror's ability to decide the case fairly. 811 F.2d at 51.

The district court clearly followed steps one and two and the first part of step three outlined above. The question is whether, after ascertaining that each juror did not know the content of the article, the court was required to go on to make an additional inquiry into the juror's ability to remain impartial. Citing such cases as *United States v. Aragon,* 962 F.2d 439 (5th Cir.1992), McDonough argues that the failure to make this additional inquiry was an abuse of discretion. The government responds that the scope of the district court's inquiry was adequate and that defendant failed to preserve this issue for appeal.

Defendant's reliance on *Aragon* is clearly misplaced. There, the district court, "[w]ithout even a cursory glance at [an inflammatory] newspaper article," refused to conduct any voir dire of the jurors whatsoever. 962 F.2d at 442. In this case, the district court conscientiously questioned each of the jurors outside the presence of the others. Although two of the jurors had seen the article but had not read it, and one had read only so much of it as to determine that it concerned the instant trial, all reported that they did not know its content. The only juror who admitted having read part of the article indicated that he would not be influenced by it. As to the others, it is difficult to see how jurors who are aware of the existence of a news article, but unaware of its content, could be prejudiced by such awareness. See *United States v. Agueci,* 310 F.2d 817, 832–33 (2d Cir.1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); see also 3 Charles A. Wright, Federal Practice and Procedure Criminal 2d § 554, at 254–58 & n. 7 (1982 & 1995 pocket part).

■ In addition, it appears that prior to learning of the alternate juror's ex parte contact with the judge, defendant failed to request any additional inquiry regarding juror impartiality. See *United States v. Rivalta,* 892 F.2d 223, 229 (2d Cir.1989), cert. denied, 502 U.S. 875, 112 S.Ct. 215, 116 L.Ed.2d 173 (1991); *United States v. Scopo,* 861 F.2d 339, 350 (2d Cir.1988), cert. denied,

490 U.S. 1048, 109 S.Ct. 1957, 104 L.Ed.2d 426 (1989). The trial court is not required to specifically question jurors as to whether they are able to remain impartial. *Rivalta,* 892 F.2d at 228–29. The court could certainly "ascertain," *Gaggi,* 811 F.2d at 51, that these jurors, who had been given a cautionary instruction and reported that they did not know the content of the offending article, could remain impartial.

■ McDonough argues that the district court nonetheless failed to assess the credibility of the jurors. In denying the motion for a mistrial, the court stated, "I have to be guided by what the jurors told me. *Whether or not I believe it is of no moment.*" (emphasis supplied). Defendant, however, did not request a specific credibility finding in the district court. In any event, there is no evidence to refute the jurors' denials, and in the absence of such evidence, the district court was entitled to presume that the jury followed its instructions to avoid contact with news reports about the trial and to limit their exposure if contact was unavoidable. See *United States v. Casamento,* 887 F.2d 1141, 1154 (2d Cir.1989), cert. denied, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). Moreover, the court's denial of defendant's motion for a mistrial is a fair indication that it did not consider the jurors' representations to be unreliable.

■ McDonough also faults the district court for failing to record part of its January 31, 1994 conversation with the alternate juror. He argues that as a result, this court is deprived of a complete record to review. We have previously urged "trial judges to make every effort to assure that any communication from a juror, no matter how trivial, is either in writing or recorded in the trial transcript." *United States v. Leung,* 40 F.3d 577, 584 (2d Cir.1994). A complete record of an ex parte juror communication is especially important where it concerns the potentially prejudicial effects of trial publicity. In this case, however, the district court clearly did its best to compensate for the inadvertent temporary absence of the court reporter. A substantial portion of the conversation with the alternate juror was in fact recorded, and the district court, shortly after the conversation occurred, reported to the parties the substance of the unrecorded portion.

■ McDonough also argues that further inquiry of the alternate juror should have been allowed because of the incomplete record. However, the district court's decision not to allow further inquiry of the alternate juror was reasonably calculated to minimize prejudice. The court characterized the alternate juror as teary-eyed, "very emotional" and "babbling," and stated, "I am just afraid that if I ask her any more questions, it might steer her one way or another.... She actually told the same story twice." The court also remarked that nothing the alternate juror had said was inconsistent with anything reported by any other juror. Finally, the court remarked that it would reconsider the matter if the alternate juror were called upon to deliberate, which she was not. Cf. *United States v. Pappas,* 445 F.2d 1194, 1202 (3d Cir.), cert. denied sub nom. *Mischlich v. United States,* 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971). Thus, it is a fair conclusion that no prejudice resulted from the court's failure to conduct a further inquiry.

### 2. The "*Allen* rule" remark

■ McDonough points to the remark by one juror during deliberations, "I guess that means the judge is going to be giving an *Allen* rule," as evidence that the jury was tainted by the trial publicity and disregarded the judge's instructions to avoid media reports about the trial. Again, McDonough failed to raise any objection when the trial court reported the remark to the attorneys. In any event, defendant does not argue that this juror's statement is indicative of any bias. Nor does he argue that the article alluding to the anticipated *Allen* charge contained information concerning defendant's guilt or innocence, which it did not. Most of the article simply noted how long the jury had deliberated, explained the different outcomes that were possible and listed the testimony that the jury had already requested to rehear. Thus, the remark about the *Allen* charge was insufficient to show that defendant was deprived of a fair trial.

B. Challenges to Specific Counts of Conviction

### 1. Extortion counts

McDonough challenges his conviction on Counts Four, Ten and Eleven. These counts respectively charged him with: extortion under color of official right with regard to the Town of Brunswick in violation of the Hobbs Act, 18 U.S.C. §§ 1951 & 2 (Count Four); conspiracy to violate the Hobbs Act by extorting kickbacks on Rensselaer County insurance contracts under color of official right (Count Ten); and extortion of kickbacks on Rensselaer County insurance contracts (Count Eleven).

#### a. jury charge

■ McDonough argues that the jury instructions on the extortion counts were inadequate because they lessened the government's burden of proof on the element of the extortion victim's state of mind. Although the government contends that McDonough failed to object properly to the challenged instruction, the record indicates otherwise. We therefore examine the jury instruction to determine if the charge as a whole prejudiced the defendant. *United States v. Locascio,* 6 F.3d 924, 939 (2d Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994).

■ In order for a jury to find a defendant guilty of extortion under color of official right, the government must prove beyond a reasonable doubt that the victims were motivated to make payments as a result of the defendant's control or influence over public officials and that the defendant was aware of this motivation. *United States v. Margiotta,* 688 F.2d 108, 132–33 (2d Cir.1982), cert. denied, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). As to the extortion counts in the present case, the district court instructed the jury that the government was required to prove beyond a reasonable doubt:

> that defendant Edward F. McDonough, Jr., exercised official powers or exerted actual control over decision making.... [or that he] knew the *motivation of the alleged victim named in each given count of the indictment to make any payment*

focused, at least in part, on the reasonably perceived ability of Edward F. McDonough, Jr., to influence official action.... *A victim's belief* that the defendant ... was able to influence official action must be reasonable....

(emphases supplied). This portion of the instruction did not specifically identify the victims whose motivation was an element of the offense. In contrast, defendant had requested an instruction that named O'Connor and Petro as the only victims whose states of mind were relevant. Defendant contends that the court's instruction erroneously allowed the jury to find McDonough guilty even if individuals other than O'Connor or Petro believed McDonough had authority to appoint the Brokers of Record for the Town of Brunswick and Rensselaer County. This argument is without merit.

The presidents of the insurance agencies are not the only individuals whose motivation matters. See *United States v. Dye Constr. Co.,* 510 F.2d 78, 82 (10th Cir.1975). Both the indictment and the jury charge as a whole clearly identified the O'Connor Agency and the R.J. Carignan Agency as the extortion victims. As the district court charged, a corporation can "only act through natural persons as its agents or employees." Therefore, the jury was entitled to consider the states of mind, not only of O'Connor and Petro, but also of other corporate agents in determining the victims' motivation, and the jury charge was not improper.

#### b. sufficiency of the evidence

■ McDonough also argues that the evidence was insufficient to convict him on the extortion counts. In particular, he claims that the evidence did not establish that O'Connor and Petro paid him kickbacks because of his ability to control public officials. He also maintains that the evidence did not establish that he was aware of any such motivation.

■ "An appellant challenging the sufficiency of the evidence bears a very heavy burden." *United States v. Rivera,* 971 F.2d 876, 890 (2d Cir.1992) (citation and internal quotations omitted). We review the sufficiency of the evidence in the light most favor-

able to the government, *United States v. Amato*, 15 F.3d 230, 235 (2d Cir.1994), and draw all reasonable inferences in the government's favor. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Torres*, 901 F.2d 205, 216 (2d Cir.), cert. denied sub nom. *Cruz v. United States*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). "The conviction must stand if any rational trier of fact could have found the essential elements of the crime established beyond a reasonable doubt." *United States v. Moore*, 54 F.3d 92, 100 (2d Cir.1995).

Considered in the light most favorable to the government, the evidence was clearly sufficient to convict defendant on the extortion charges. Count Four charged defendant with extortion of kickbacks from the O'Connor Agency on insurance contracts for the Town of Brunswick. O'Connor, who was one of the government's principal witnesses at trial, testified that he believed that McDonough "controlled" the insurance account for the Town of Brunswick and could "broker that piece of business ... with any agency that he thought was capable of performing the job." He also said that if the payments were not made, McDonough "would most likely take [the business] to another agency where he would receive the commission on it." He further testified that he believed that McDonough had the power to determine who would write the town's insurance policies because "[h]e was the Democratic Chairman and was very, very close with Romeo Naples," the Brunswick Supervisor and Vice-Chair of the Rensselaer County Democratic Committee.

The government also submitted evidence that O'Connor's payments to McDonough amounted to nearly $100,000, for which McDonough performed almost no work. O'Connor's former business partner, Kim Julian-Brown, testified that she argued with O'Connor about these payments and McDonough's lack of work. O'Connor told her that if the payments were not made, McDonough would take the business away. O'Connor also told her that McDonough was in turn kicking back part of the commission money to Romeo Naples. Based upon this evidence, a rational juror could conclude that O'Connor believed that McDonough was able to control or influence public officials in the Town of Brunswick, and that this belief, at least in part, motivated the O'Connor Agency to pay kickbacks. Cf. *Margiotta*, 688 F.2d at 131–33.

Turning to Counts Ten and Eleven regarding Petro's payments of nearly $500,-000 to Collar City, the evidence was also sufficient to show that Petro paid the money because he believed McDonough had the power to control and influence Rensselaer County public officials. Petro testified that if he had not made the payments, defendants "just wouldn't place [Rensselaer County's insurance] business with us, we wouldn't write it.... I believe they would have taken the business to another agent." He further testified, "I assume because of [defendant's] position with the party that he was able to determine where the insurance would be written."

Although Petro characterized his state of mind regarding McDonough's influence as an assumption, this does not render the evidence legally insufficient. The jury clearly could infer that Petro would not have paid defendant almost half a million dollars for performing virtually no insurance work unless he believed McDonough had the power to place insurance contracts. Cf. *McCormick v. United States*, 500 U.S. 257, 270, 111 S.Ct. 1807, 1815, 114 L.Ed.2d 307 (1991) ("[M]atters of intent are for the jury to consider.").

McDonough argues that the jury improperly failed to credit parts of O'Connor's and Petro's testimony, which suggested that sharing commissions was a longstanding and customary industry practice and that Petro split fees with other insurance agents. Even if fee splitting were customary on *non-municipal* accounts, there was no persuasive evidence that either O'Connor or Petro customarily split fees on *municipal* insurance accounts. To do so, without McDonough's rendering insurance services, would have been unlawful. N.Y. Ins. Law § 2128 (McKinney's).

Moreover, the government submitted evidence that O'Connor and Petro filed false and misleading disclosure documents, destroyed authentic documents and lied to

newspapers and the public about the nature of their relationship with McDonough. Based upon this evidence, the jury could conclude that the payments were not innocently motivated. See *Margiotta,* 688 F.2d at 135.

■ In any event, the government was not required to show that the transactions had no valid purpose. The jury was only required to conclude that the payments were partially motivated by the victims' belief that McDonough would use his control or influence over public officials to award insurance business for the Town of Brunswick and Rensselaer County. See *United States v. Coyne,* 4 F.3d 100, 113 (2d Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 929, 127 L.Ed.2d 221 (1994); *United States v. Biaggi,* 909 F.2d 662, 683 (2d Cir.1990), cert. denied, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991). As noted above, the evidence was sufficient for this purpose.

■ As to McDonough's awareness of the motives underlying the payments, the jury could infer such awareness without the benefit of direct testimony. Cf. *United States v. Friedman,* 854 F.2d 535, 554 (2d Cir.1988), cert. denied, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). As discussed above, the government produced evidence that McDonough received substantial payments from the O'Connor Agency and the R.J. Carignan Agency without rendering services and that these agencies were designated as Brokers of Record for the Town of Brunswick and Rensselaer County respectively. The government also presented evidence of McDonough's efforts to cover up the transactions when they began to come to light. This evidence was more than sufficient to permit a rational juror to find that McDonough was aware of the motives behind the payments.

### 2. Mail fraud count

#### a. jury charge

■ Defendant argues that his mail fraud conviction should be reversed because the district court gave an erroneous instruction to the jury. Count Eight charged McDonough with obtaining kickbacks through a scheme or artifice in violation of 18 U.S.C. § 1341. Specifically, the grand jury indictment charged that the purpose of the scheme was to defraud the citizens and government of Rensselaer County "of 1) money, property, and other things of value … *and,* 2) their right to control their money, property, and other things of value," (emphasis supplied). The district court charged the jury that it could convict if it found that the object of the plan was "to deprive … citizens and officials … of money *or* the right to control their money or both," (emphasis supplied). McDonough argues that because the indictment charged him with two purposes in the conjunctive, the government was required to prove both at trial. This argument is meritless.

First, when defendant raised this argument in the district court, the government moved for and was granted permission to amend the indictment. In the amended indictment, the word "or" replaced the word "and," clearly indicating that the jury could convict on either ground. On appeal, defendant has not challenged the ruling granting the amendment.

■ Even had the indictment not been amended, the conviction would stand. Where there are several ways to violate a criminal statute, as there are with the mail fraud statute, see *United States v. Wallach,* 935 F.2d 445, 462–63 (2d Cir.1991), cert. denied, —— U.S. ——, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993), "[f]ederal pleading requires … that an indictment charge in the conjunctive to inform the accused fully of the charges." *United States v. McGinnis,* 783 F.2d 755, 757 (8th Cir.1986). A conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in any of the ways charged. *United States v. Lemire,* 720 F.2d 1327, 1345 (D.C.Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); see also *Griffin v. United States,* 502 U.S. 46, 50–51, 112 S.Ct. 466, 469–470, 116 L.Ed.2d 371 (1991). Defendant was charged with depriving citizens of money and the right to control money. Thus, he could have been convicted under either of these theories, and the district court did not give an erroneous instruction to the jury.

b. sufficiency of evidence

 Defendant also argues that the evidence was insufficient to support a conviction on Count Eight because there was no evidence that he intended to obtain money by false pretenses or that he intended to inflict financial harm on the Town of Brunswick or Rensselaer County. However, the government did not seek to prove only that McDonough acted with false pretenses. Rather, the government's primary theory appears to have been that McDonough defrauded Rensselaer County citizens and officials by means of nondisclosure and concealment of information about the kickback scheme that he had a duty to disclose. See, e.g., *United States v. Bronston*, 658 F.2d 920, 926–27 (2d Cir.1981), cert. denied, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).

 Regarding McDonough's intent to inflict financial harm, all that the government was required to show was that defendant contemplated *some* actual harm to the county, *Wallach*, 935 F.2d at 461, which "may be inferred from the totality of the circumstances and need not be proven by direct evidence." *United States v. Alston*, 609 F.2d 531, 538 (D.C.Cir.1979), cert. denied, 445 U.S. 918, 100 S.Ct. 1281, 63 L.Ed.2d 603 (1980).

There was certainly sufficient evidence to permit a rational juror to conclude that McDonough contemplated such financial injury. For example, the government submitted evidence of McDonough's efforts to conceal the kickbacks, which included organizing Collar City, with his wife as nominal head, just prior to commencement of the kickbacks from Petro's R.J. Carignan Agency. As the district court observed at sentencing, "the very creation of the Collar City Agency sp[eaks] . . . volumes about the fact that it was a coverup and an attempt to hide what . . . [defendant] believed[ ] to be an illegal venture." In addition, the jury could have relied upon evidence that McDonough participated in government decisions on insurance matters without disclosing his interest in receiving kickbacks on commissions. In particular, the government presented testimony that McDonough took part in negotiations with the Rensselaer County Executive during which he successfully opposed a proposal to adopt a new system of partial self-insurance that would have reduced costs. Without disclosing his conflict of interest, McDonough participated in preparing a report that recommended increasing insurance expenditures by $450,000. Finally, the jury could also have inferred the requisite level of intent from evidence that the county in fact paid lower insurance fees before and after the scheme began than it did while the scheme was ongoing.

3. Racketeering

McDonough challenges his racketeering conviction on the sole ground that the predicate acts—mail fraud and extortion—were not proved. Because we have already affirmed McDonough's conviction on these charges, we affirm the racketeering conviction as well.

We have considered all of defendant's arguments and find that they are without merit. The judgment of conviction is affirmed.