**UNITED STATES of America, Appellee,**

v.

**Thomas B. MIDDLEMISS, William Orfanos and Setiri Sotiriou, Defendants–Appellants.**

Nos. 99–1069, 99–1108, 99–1109.

United States Court of Appeals, Second Circuit.

Argued: Nov. 18, 1999.

Decided: June 21, 2000.

Deborah A. Schwartz, New York, NY, for Defendant–Appellant Thomas B. Middlemiss.

Spiros A. Tsimbinos, Kew Gardens, NY, for Defendant–Appellant Setiri Sotiriou.

Kevin G. Snover, North Babylon, NY, for Defendant–Appellant William Orfanos.

Jonathan N. Halpern, Assistant United States Attorney, (Mary Jo White, United States Attorney, Ira M. Feinberg, Assistant United States Attorney, on the brief) New York, NY, for Appellee.

Before: KEARSE, PARKER, and POOLER, Circuit Judges.

POOLER, Circuit Judge:

Defendants Thomas B. Middlemiss, William Orfanos and Setiri Sotiriou appeal respectively from two February 2, 1999, judgments and a February 19, 1999, judgment of the United States District Court for the Southern District of New York (Sidney H. Stein, *J.*) following their convictions after a jury trial on multiple conspiracy, extortion, mail fraud and tax-related charges.

## BACKGROUND

A 22–count superseding indictment filed on March 17, 1998, charged defendants with a lengthy extortion scheme victimizing George Lagaris. According to the government, Lagaris, who operated several restaurants including the New City Diner in Rockland County, knew Orfanos, who was a special agent in the U.S. Secret Service and assigned to the John F. Kennedy International Airport. In 1991, Lagaris and Orfanos did business together briefly when Lagaris helped Orfanos operate and sell a Dunkin Donuts franchise shop in Long Island that Orfanos owned with his brother. Also in 1991, Orfanos asked Lagaris if he was interested in operating a diner at the JFK Airport. Orfanos told Lagaris that he and Middlemiss, who worked at the airport, could obtain a lease for Lagaris' restaurant. Middlemiss was a public affairs officer for the Port Authority of New York & New Jersey, which operated the airport.

In exchange for their help in finding a location and obtaining a lease, Middlemiss and Orfanos wanted an interest in Lagaris' airport restaurant. Lagaris established a corporation, JFK Diner, Inc., in which Middlemiss and Orfanos each had a 12½ percent interest. The interest was held in the names of the wives of Middlemiss and Orfanos. Middlemiss and Orfanos originally wanted a total 20 percent interest in the business, but Lagaris increased the percentage to keep the math easier for him. Lagaris' own attorney initially drew up the corporate papers, but Lagaris later brought the legal work to Sotiriou at the suggestion of Orfanos. Sotiriou then transferred the wives' interests to his own name.

The airport diner never materialized. However, Middlemiss subsequently

learned at a Port Authority staff meeting that airport officials planned to reopen an employee cafeteria. Middlemiss passed this information to Lagaris through Orfanos. Middlemiss also made several contacts with airport officials responsible for the project to recommend Lagaris for the cafeteria lease and to check on the lease approval process. Middlemiss never disclosed to airport officials his financial interest in Lagaris' corporation. Lagaris was the only candidate for the lease, which he obtained. After investing more than $85,000 in the project, Lagaris opened the cafeteria in December 1992.

Approximately seven weeks later, Orfanos during a meeting in Sotiriou's office demanded a $6,500 share of cafeteria profits from Lagaris, who refused and said the business was not yet profitable. After several discussions among Lagaris, Orfanos and Sotiriou, Lagaris agreed to pay $2,000 monthly to Middlemiss and Orfanos. The government contends that Lagaris made these payments because he was afraid that Middlemiss and Orfanos would interfere with his airport lease or cause tax and health department officials to investigate him, thereby costing Lagaris his substantial investment. Defendants claim that they were entitled to a share of the cafeteria profits as a result of their corporate interests. Lagaris made $2,000 monthly payments for 14 months starting in April 1993. Lagaris brought the payments in cash to Sotiriou's office, and Sotiriou forwarded the money to Middlemiss and Orfanos.

In 1994, Lagaris refused to make additional monthly payments and asked Middlemiss and Orfanos to buy out his share of JFK Diner, Inc. In response, defendants first insisted that they had a buyer for the business. The government contends that defendants created false documents to give the impression of a third-party buyer for the cafeteria. Defendants then demanded that Lagaris pay them a lump-sum final payment in exchange for their corporate interest. A friend of La-

garis, Elias Bonaros, assisted Lagaris in the final negotiations. Lagaris ultimately paid Orfanos and Middlemiss $45,000 in cash in September 1994. The final payment took place in Sotiriou's office in the presence of Orfanos, Bonaros, Middlemiss and Sotiriou. Lagaris operated the cafeteria until July 1996. At about the same time, government officials began investigating the business. During a July 1996 government interview with Sotiriou at his office, Sotiriou claimed to be Lagaris' only partner in the cafeteria and denied knowledge of several corporate documents later found in his office files.

A federal grand jury indicted defendants in September 1997. A second superseding indictment charged defendants in 22 counts with conspiracy, extortion, mail fraud, and various tax crimes. The indictment also charged Orfanos with making a false statement on a questionnaire related to his government employment. The district court in May 1998 severed eight of the tax charges against Middlemiss as unrelated to the Lagaris extortion scheme. The district court also severed two tax charges against Orfanos and transferred them to the Eastern District of New York. A jury trial on counts one through twelve of the indictment took place for two weeks in June 1998. The jury convicted all three defendants on all counts, with the exception of an acquittal for Orfanos on the false statement charge. Judge Stein sentenced Middlemiss on January 29, 1999, to 33 months imprisonment, two years supervised release, $450 special assessment, and $73,000 restitution. Judge Stein sentenced Orfanos on January 29, 1999, to 33 months imprisonment, two years supervised release, $350 special assessment, and $73,000 restitution. Both men currently are serving their sentences. Judge Stein sentenced Sotiriou on February 17, 1999, to 27 months imprisonment, two years supervised release, $10,000 fine, $250 special assessment, and $73,000 restitution. Sotiriou received a stay of his sentence pend-

ing appeal. All three defendants appeal their convictions and sentences.

## DISCUSSION

### I. Sufficiency of the evidence

Defendants Middlemiss and Sotiriou principally contend that the government presented insufficient evidence on which to convict them for (1) extortion through wrongful use of fear of economic loss; (2) extortion under color of official right; and (3) use of mail fraud to deprive the Port Authority of Middlemiss' honest services.[1] Defendants also claim that the government presented insufficient evidence that venue in the Southern District of New York was proper.

 Defendants challenging their convictions on sufficiency grounds bear a "heavy burden." *United States v. Matthews,* 20 F.3d 538, 548 (2d Cir.1994). The reviewing court must affirm defendants' convictions if, "viewing all the evidence in the light most favorable to the prosecution, [it] finds that '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.1997) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)) (citation omitted) (emphasis in *Jackson*). The reviewing court must view as a whole all of the trial evidence and defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony. *See id.* "[T]he government's proof need not exclude 'every possible hypothesis of innocence.'" *Id.* (citation omitted).

### A. Extortion

The government charged two theories of extortion pursuant to 18 U.S.C. § 1951(a) and (b)(2). The first theory was that defendants extorted money from Lagaris "under color of official right" when they set up the diner corporation because Lagaris gave Middlemiss and Orfanos shares in JFK Diner, Inc. in exchange for their assistance as airport officials to obtain the restaurant lease. The second theory was that defendants extorted money from Lagaris through wrongful use of fear of economic loss when they demanded the $2,000 monthly payments and $45,000 final payment. The government claims, based on Lagaris' testimony, that Lagaris paid defendants because he reasonably believed that they had power to influence airport and other officials who could terminate his cafeteria lease or begin administrative investigations into the health and tax code compliance of his businesses, which would threaten Lagaris' economic investments.

 In order to prove extortion under color of official right, "the [g]overnment need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts," and "proof of an explicit promise to perform the official acts in return for the payment is not required." *United States v. Delano,* 55 F.3d 720, 731 (2d Cir.1995) (quotation and citation omitted). Put another way, "the government must prove beyond a reasonable doubt that the victims were motivated to make payments as a result of the defendant's control or influence over public officials and that the defendant was aware of this motivation." *United States v. McDonough,* 56 F.3d 381, 388 (2d Cir.1995). The victim's belief that defendant was able to influence official action must be reasonable. *See id.* (quoting jury instructions).

---

1. While Middlemiss and Sotiriou also challenge the sufficiency of the evidence with regard to their conspiracy to commit extortion convictions, neither makes an argument that the evidence of the conspiracy is insufficient independent of the sufficiency of the evidence on the substantive count. Thus, we construe defendants' argument on this point to be that if the evidence on their substantive extortion convictions is insufficient, so too is the sufficiency of the evidence regarding their conspiracy convictions. Because we reject defendants' arguments regarding the sufficiency of the evidence on their substantive extortion counts, we also reject their sufficiency argument with regard to their conspiracy counts.

■ With respect to extortion through wrongful use of fear of economic loss, the element of fear that Section 1951 requires is satisfied where a victim reasonably fears economic loss. *See United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (*en banc*). The jury must consider the victim's perspective, and "the proof need establish that the victim *reasonably* believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." *Id.* at 951 (emphasis in original). The statute does not define the required cause of the victim's fear, and "the wrongful use of fear need not be a consequence of an implicit or explicit threat." *United States v. Abelis*, 146 F.3d 73, 83 (2d Cir.), *cert. denied*, 525 U.S. 1009, 119 S.Ct. 527, 142 L.Ed.2d 437 (1998).

■ Defendants Middlemiss and Sotiriou argue that the evidence of extortion was insufficient to convict them because (1) Lagaris voluntarily made the corporate arrangements and paid them in an attempt to obtain influence and advocacy, not out of fear; (2) Lagaris paid defendants because of their legitimate shared business interest; and (3) Lagaris could not have reasonably believed that defendants would use their power to his detriment. Defendants' first argument that Lagaris gave Orfanos and Middlemiss a corporate interest merely to obtain influence in fact supports the government's theory of extortion under color of official right. The government presented sufficient evidence—primarily through Lagaris' testimony about his conversations with Orfanos and Middlemiss—that defendants knew Lagaris paid them in exchange for official acts Lagaris believed that they could perform. Although Middlemiss also contends that he received the corporate interest as a finder's fee for locating the cafeteria spot, the jury was entitled to conclude that Middlemiss was not entitled to any payment. Middlemiss claims that he is not guilty of extortion because his only act was to rec-ommend Lagaris to a single airport official and he did not engage in lobbying. However, the government presented evidence that Middlemiss' involvement was more extensive, and the jury rationally could rely on that evidence. An official's lobbying efforts in exchange for payment can show extortion under color of official right. *See United States v. Coyne*, 4 F.3d 100, 111 (2d Cir.1993).

The jury also was entitled to reject defendants' second argument that Lagaris paid defendants because of a legitimate business interest. The jury could infer that the origin of the corporate interest in JKF Diner, Inc. was the result of extortion under color of official right, so no legitimate payments could flow from it. More important, the jury heard evidence from which it rationally could infer that the payments were unrelated to profits or defendants' corporate interests because (1) the payments began before the cafeteria turned a profit; and (2) defendants determined the amount without examining the corporation's books. In a similar vein, Orfanos argues that Lagaris paid him because Lagaris owed Orfanos money from the prior Dunkin Donuts franchise transaction, but the jury was free to reject his evidence and credit the government's version of events. Defendants also argue that the government had to prove that they did not believe they legitimately were entitled to the payments. Defendants rely upon *United States v. Sturm*, 870 F.2d 769 (1st Cir.1989), in which the First Circuit held that "the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property." *Id.* at 773 (footnote omitted). However, the evidence was more than sufficient to permit the jury rationally to conclude that both Orfanos and Middlemiss knew they were not entitled to a corporate interest or a stream of payments from Lagaris.

Defendants' third principal argument, that as a matter of law Lagaris could not reasonably have believed they would use

their power to his detriment, is without merit. The jury was entitled to credit the testimony of the extortion victim, who said that he believed defendants had influence not only to obtain the lease for him but also to take it away from him. Contrary to defendants' arguments, this case is different from *Capo,* which involved the economic-fear theory and found no extortion because no "victim" feared adverse consequences from nonpayment. *See Capo,* 817 F.2d at 952. Lagaris testified that he feared adverse consequences to his cafeteria and diner businesses if he did not pay defendants after he used their influence to obtain the airport lease. In light of this evidence, it is immaterial that defendants may not have made explicit threats to Lagaris. Defendants instilled this fear when Orfanos told Lagaris that Middlemiss was upset and needed to be calmed down and that Middlemiss did not want to see Lagaris. For essentially the same reason, this case is not like *United States v. Garcia,* another economic-fear theory case, where the victim by paying money "was not risking the loss of anything to which it was legally entitled." *United States v. Garcia,* 907 F.2d 380, 383–84 (2d Cir.1990). At the time defendants demanded the stream of payments, Lagaris was entitled to operate the cafeteria pursuant to his lease and free of unwarranted tax or health department investigations. Orfanos and Middlemiss contend that the ethical violations they committed by not disclosing their interest in JFK Diner, Inc. to airport officials do not rise to the level of criminal culpability. However, the jury rationally could infer criminal intent from the nondisclosure and use this fact in combination with other proof presented at trial to conclude that defendants wrongfully used their positions within the airport as leverage to demand Lagaris' payments.

Finally, defendant Sotiriou argues that the evidence at trial was insufficient to show that he did anything more than act as an attorney for Orfanos and Middlemiss and help them obtain money to which they were entitled. As noted above, the jury rationally could infer that Middlemiss and Orfanos were not entitled to the money Lagaris paid them. Moreover, the government presented ample evidence that Sotiriou played an active role in all phases of the extortion scheme because (1) he helped draw up the JFK Diner, Inc. documents hiding the interests of Middlemiss and Orfanos; (2) he wrote letters to Lagaris in connection with payment demands; (3) he negotiated and collected the cash payments from Lagaris; and (4) he helped create the impression that a buyer for the cafeteria existed. Moreover, Sotiriou made false exculpatory statements to investigators in which he denied knowledge of the participation of Middlemiss and Orfanos. Although Sotiriou claims that these statements were consistent with an innocent purpose of protecting client confidentiality, the jury was entitled to infer otherwise. *See United States v. Anglin,* 169 F.3d 154, 160 (2d Cir.1999) (holding that false exculpatory statements and other circumstantial evidence permit jury to infer guilt).

Consequently, the government presented sufficient evidence to sustain the extortion convictions of all three defendants. Given this holding, it is irrelevant that the jury returned a general verdict that did not specify which extortion theory they adopted. As noted more fully below, the jury did not have an erroneous view of the law, so the extortion convictions were both legally and factually sufficient to withstand appellate review.

## B. Mail fraud

The government charged that defendants committed mail fraud by scheming to deprive the Port Authority of its right to Middlemiss' honest services, in violation of 18 U.S.C. §§ 1341 and 1346. Defendants contend that the evidence supporting this charge was insufficient. While Middlemiss may have schemed to conceal his financial interest in JFK Diner, Inc. from his employer, they argue that he did not

render dishonest or corrupt services because his official job duties had nothing to do with airport leasing. Therefore, defendants contend that Middlemiss did not deprive the Port Authority of disinterested decision-making or proper job performance.

Section 1346 "make[s] it a crime to devise a *scheme* to deprive another of the right of honest services" and this scheme to defraud is an essential element of the crime. *United States v. Sancho*, 157 F.3d 918, 920 (2d Cir.1998) (*per curiam*) (emphasis in original), *cert. denied*, 525 U.S. 1162, 119 S.Ct. 1076, 143 L.Ed.2d 79 (1999). In *Sancho*, we sustained a mail fraud conviction where defendant agreed to bribe someone he believed was a consultant to the defrauded entity but who in fact was an imposter. *See id.* at 920–21. We held that the statute does not require an actual fiduciary relationship between the individual who defendant believes provides services and the entity being defrauded of honest services. *See id.* The important factor was that defendant engaged in conduct "for the purpose of executing a scheme to deprive another of the right of honest services." *Id.* at 921. Therefore, as long as defendants engaged in a scheme to deprive the Port Authority of honest services, there is no requirement that the scheme also implicate Middlemiss' official duties. Defendants cite a Fifth Circuit case, which holds, "[i]f the employee renders all the services his position calls for, and if these and all other services rendered by him are just the services which would be rendered by a totally faithful employee, and if the scheme does not contemplate otherwise, there has been no deprivation of honest services." *United States v. Brumley*, 116 F.3d 728, 734 (5th Cir.1997). However, the Fifth Circuit also held that criminal liability attaches if "defendant was conscious of the fact that his actions were something less than in the best interests of the employer." *Id.*

■ Under either view of the law, the government presented sufficient evidence

to sustain the mail fraud convictions. There was evidence that Middlemiss in fact used his position at the airport to further the scheme involving Lagaris because he learned of the cafeteria project at a staff meeting and used his inside contacts to recommend Lagaris and follow up on the lease application. As a result of defendants' plot, the Port Authority considered no other operators for the cafeteria. Furthermore, Middlemiss violated his employer's rules regarding conflicts of interest and financial disclosures. Middlemiss thus did not render all the services that a totally faithful employee would have provided the Port Authority, and his actions were not in the best interests of his employer. Moreover, it is without dispute that the entire premise of the mail fraud scheme was that Middlemiss had power to secure and take away the cafeteria lease, and that is the reason Lagaris paid him anything at all. The scheme therefore did not contemplate that Middlemiss would provide honest services.

Finally, the mailings of lease documents from the airport to Lagaris' home were at least incident to an essential part of the scheme involving Lagaris, which was to secure the lease and extort payments from the resulting business. *See United States v. Altman*, 48 F.3d 96, 102 (2d Cir.1995) (holding that the "scheme to defraud need not contemplate the use of the mails as an essential part of the scheme as long as the mailing is *incident* to an essential part of the scheme" (quotation and citation omitted) (emphasis in original)). Consequently, the government presented sufficient evidence of mail fraud.

### C. Venue

■ Defendants argue that the government presented insufficient evidence to sustain venue in the Southern District of New York because the cafeteria was located in the Eastern District of New York, all defendants worked within the Eastern District, and the alleged extortion payments took place in the Eastern Dis-

trict. The government must prove, "by a preponderance of the evidence, that some part of the crime was committed within the district of the prosecution." *United States v. Maldonado–Rivera*, 922 F.2d 934, 968 (2d Cir.1990). Here, the government presented evidence that some of the money Lagaris used to pay defendants came from the proceeds of his diner located in the Southern District of New York, the letters associated with the mail fraud counts went to Lagaris' home in the Southern District, and the original JFK Diner, Inc. documents were drafted in the Southern District. These facts are sufficient to establish venue.

## II. Jury charge

▮▮▮ Defendants Middlemiss and Sotiriou next contend that the charge Judge Stein read to the jury contained four distinct errors that collectively or separately amounted to plain error. Defendants acknowledge that they did not object to the charges during the trial. We therefore review the instructions for plain error. *See United States v. Ballistrea*, 101 F.3d 827, 834 (2d Cir.1996). Reversal is required if the unpreserved error is plain, "affects a substantial right," and "seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Zvi*, 168 F.3d 49, 58 (2d Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 176, 145 L.Ed.2d 148 (1999) (citation omitted). We examine the jury instructions "as a whole and in the context of the entire trial." *Id.*

▮▮▮ Defendants argue first that the district court should have instructed the jury regarding the claim of right defense to the extortion and extortion conspiracy charges. Specifically, defendants claim that because they could have believed they legitimately were entitled to the payments Lagaris made, Judge Stein needed to instruct the jury that, in order to convict, it had to find defendants knew they were not entitled to the money. *See Sturm*, 870 F.2d at 775–77. In *Sturm*, the First Circuit treated the claim of right as an aspect of intent and held that the trial court should have instructed the jury on both objective and subjective definitions of "wrongful." *See id.* at 775. Without deciding whether claim of right is a defense or an aspect of intent, we hold that Judge Stein's failure to give a specific claim of right instruction was not plain error. The court's instruction regarding extortion described the wrongful use of fear and explained that defendant had to intentionally exploit the fear. In addition, in the charge regarding conspiracy to commit extortion, Judge Stein described the required intent element as "knowingly and willfully" and defined those terms.[2] While we prefer the district court to explicitly instruct the jury that it must find that defendants were not lawfully entitled to the property they obtained through wrongful use of fear, *cf. United States v. Jackson*, 196 F.3d 383, 387 (2d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 2731, 147 L.Ed.2d 993 (2000), Judge Stein's charge as a whole conveys that idea. No plain error is present.

▮▮▮ Defendants argue second that the instruction regarding the "quid pro quo" element of extortion under color of official right was deficient and confusing because it concentrated on the payor's understanding of what he was buying rather than the intent of the receiver. However, the instructions that the court read accurately focus on the defendants' intent with respect to the payments and the connection

---

**2.** In a related argument, Sotiriou contends that the district court erred because it did not define willfully and knowingly separately in the substantive extortion charge. However, the substantive charge does contain these words, and the court defined the terms during its extortion conspiracy ·charge and mail fraud charge. Under these circumstances, no plain error is present. *See United States v. Jones,* 30 F.3d 276, 283–84 (2d Cir.1994) (finding no plain error where conspiracy charge but not substantive charge contained specific instruction for knowledge and intent).

between payments and official action. Defendants' reliance on a Supreme Court case discussing the gratuity statute is unavailing. *See United States v. Sun–Diamond Growers of Cal.*, 526 U.S. 398, 412–14, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999). Unlike the charge in that case, Judge Stein's instructions clearly conveyed that Middlemiss had to know a link existed between the money Lagaris paid him and his official act. The charge was not plainly erroneous.

■■■ Defendants argue third that the district court erred in not giving a specific charge telling the jury to consider each defendant separately. However, Judge Stein instructed the jury to consider each count of the indictment separately and to presume innocent each "particular defendant" under consideration. The charge as a whole is replete with singular references to a defendant, and the instructions were not plainly erroneous. Defendants argue fourth that the district court gave an unbalanced charge regarding consciousness of guilt because the instruction lacked language regarding the weakness of this kind of evidence and other qualifying language. The instruction that the court read was an accurate statement of the law. *See United States v. Strother*, 49 F.3d 869, 876–77 (2d Cir.1995). The jury charge was not plainly erroneous.

## III. Denial of defendants' motion for a new trial

■■■ Defendants claim that they are entitled to new trials for either of two reasons. First, Orfanos moved in January 1999 pursuant to Fed.R.Crim.P. 33 for a new trial based on newly discovered evidence in the form of witness John Siracusa, a former business partner of Lagaris. Second, defendants seek retrial because they claim that the government failed to meet its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose exculpatory statements from George Pasiakos, who knew both Orfanos and Lagaris. Judge Stein denied defendants' motions, and we review the rulings for abuse of discretion. *See United States v. Wong*, 78 F.3d 73, 78 (2d Cir.1996).

### A. New evidence

■■■ The court may grant a motion for new trial based on newly discovered evidence "if the interests of justice so require." Fed.R.Crim.P. 33. Relevant factors to a successful motion are whether (1) counsel could not have discovered the evidence with due diligence before or during trial; (2) the evidence demonstrates that a witness in fact committed perjury; (3) the new evidence is material; and (4) the new evidence is not cumulative. *See United States v. White*, 972 F.2d 16, 20–21 (2d Cir.1992). The controlling issue generally is the effect the evidence would have on the jury's verdict if it had been submitted at trial. *See id.* at 21. Granting Rule 33 motions is not favored and is done with great caution. *See Wong*, 78 F.3d at 79.

■■■ The newly discovered evidence that defendants presented was an affidavit from John Siracusa, a former business partner of Lagaris in owning and operating the New City Diner. In the affidavit, Siracusa stated that he controlled the money at the diner from February 1992 through April 1993 and that Lagaris never took money from the diner except to pay vendors. Siracusa also said that Lagaris once took $2,000 from the diner to pacify a union steward, and Siracusa stated that Lagaris never told him about an extortion scheme. In his own affidavit, Orfanos admitted that he had met Siracusa in the late 1980s or early 1990s, identified him as a potential defense witness, yet failed to contact him based on the advice of a third party, George Pasiakos. Judge Stein denied Orfanos' motion for a new trial based on the discovery of witness Siracusa because (1) defense counsel knew about the witness and could have investigated his possible testimony; and (2) the proffered testimony was "not so material and noncu-

mulative that its admission would probably lead to an acquittal."

Defendants argue that Judge Stein's decision was an abuse of discretion because Siracusa's affidavit showed that Lagaris perjured himself. However, the district court correctly noted that the period during which Siracusa controlled the New City Diner finances predated the time that Lagaris paid money to Middlemiss and Orfanos, and Siracusa's affidavit thus did not preclude the possibility that Lagaris used diner funds to make the payments. Judge Stein also correctly concluded that the evidence Siracusa offered merely was additional impeachment evidence. Furthermore, because defendant Orfanos knew about Siracusa before trial, Judge Stein properly ruled that counsel with due diligence could have discovered the evidence. The district court's denial of the Rule 33 motion was not an abuse of discretion.

### B. Brady material

■ The court must grant a motion for new trial under *Brady v. Maryland* if the government failed to disclose exculpatory evidence to the defense and the suppressed evidence was material. *See Wong*, 78 F.3d at 79. *Brady* requires the government to disclose both exculpatory and impeachment evidence. *See id.* Evidence is material "if it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (quotation and citation omitted). *Brady* requires the government to disclose material exculpatory evidence known to it but does not require the government to disclose all evidence in its possession that might assist defense preparation. *See United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993) (citing *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir.1982)).

■ Defendants claim that they suffered a prejudicial *Brady* violation because the government did not disclose until the eve of trial a memorandum of its interview with George Pasiakos, a potential defense witness who could have corroborated Orfanos' claim that Lagaris owed Orfanos money in connection with their prior Dunkin Donuts franchise deal. The district court granted defendants a 1½-day continuance of the trial to locate Pasiakos, but counsel could not find the witness. Judge Stein at the conclusion of the proceedings confirmed his earlier ruling that no new trial was warranted because defendants "knew exactly what Mr. Pasiakos was going to say" and suffered no prejudice. Judge Stein based his conclusion on the fact that defendants admitted Pasiakos was assisting them in trial preparation. Because defendants already were aware of the allegedly exculpatory evidence, they suffered no *Brady* violation. *See Zackson*, 6 F.3d at 918. Judge Stein did not abuse his discretion in denying the Rule 33 motion.

### IV. Sentencing

■ Each defendant challenges his sentence on a number of grounds. On a sentencing appeal, we review the district court's findings of fact for clear error and its application of the Sentencing Guidelines to the facts *de novo*, "giving due deference to the sentencing court." *United States v. Lewis*, 93 F.3d 1075, 1079 (2d Cir.1996).

### A. More than one extortion and sophisticated tax crime

■ First, Middlemiss contends that the district court wrongly found that the extortion scheme of his conviction involved more than one extortion pursuant to U.S.S.G. § 2C1.1(b)(1).[3] Pursuant to this guideline, if the offense involved more than one extortion, the court increases the base offense level by two levels. According to the guidelines commentary, "[r]elated payments that, in essence, constitute a single incident of bribery or extortion (*e.g.*, a number of installment payments for a single action) are to be treated as a single

---

**3.** Sotiriou also joins in this argument.

bribe or extortion, even if charged in separate counts." U.S.S.G. § 2C1.1, comment. (n. 6). Defendant claims that a single incident of extortion took place because the government charged one scheme involving the same people, the same objective of obtaining and maintaining the cafeteria lease, and only one form of cash payment.[4] The government responds that two schemes existed, one involving monthly payments and the other involving the $45,000 lump sum. According to the government, the final large payment was not an installment but a distinct payoff related to selling the business and ending defendants' extortionate demands.

Because we defer to the factual findings of the sentencing court, we affirm. Judge Stein held that, "[R]eally what was happening was you had the monthly payments, and then there was a separate determination that they would do something different than the monthly payments, there would be a buyout so that this would come to an end. It did seem to me a separate transaction, if you will, and a separate determination to obtain money in a different manner and to a different extent than had been going on before." This characterization of the trial evidence is not clearly erroneous, and Judge Stein properly increased the base offense level for more than one extortion.[5]

Middlemiss next contends that Judge Stein erred in finding that his tax crimes employed sophisticated means pursuant to U.S.S.G. § 2T1.1(b)(2), which increased his base offense level calculation by two levels. At the time of Middlemiss' sentencing, Section 2T1.1(b)(2) stated that "[i]f sophisticated means were used to impede discovery of the existence or extent of the of-

fense, increase by 2 levels." U.S.S.G. § 2T1.1(b)(2) (Nov.1997). The commentary described sophisticated means as "conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case." U.S.S.G. § 2T1.1, comment. (n. 4) (Nov.1997). "[T]he section is designed to increase punishment in those cases that, because of their sophistication, might be harder to detect and therefore require additional punishment for heightened deterrence." *Lewis*, 93 F.3d at 1081.

▮ Defendant claims that the enhancement does not apply to him because (1) the issuance of JFK Diner, Inc. stock in his wife's maiden name was not a taxable event and was not directed to conceal taxable income; (2) he did not leave a false paper trail; and (3) he merely received undeclared cash and computed his taxes with false information. The arguments are without merit. As the district court found, defendants engaged in a sophisticated scheme to conceal their interests in JFK Diner, Inc., created an extensive false paper trail of corporate documents, and accepted only cash payments to evade detection and taxation. Judge Stein also noted that the tax crimes, severed from Middlemiss' trial but included as relevant conduct for sentencing calculation, were sophisticated. The district court did not err in applying the enhancement.

## B. Downward departures

▮ Defendants Orfanos and Sotiriou each challenge Judge Stein's refusal to grant them specific downward departures. Sotiriou requested a departure pursuant to U.S.S.G. §§ 5H1.4 and 5H1.6 based on his

---

**4.** Defendant's argument that one scheme existed because the probation department grouped the extortion and mail fraud charges for sentencing is unavailing because different standards apply. *Compare* U.S.S.G. § 2C1.1 *with* § 3D1.2(a) and (b).

**5.** Even if the two-point enhancement were clearly erroneous, there would be no basis for

relief because Judge Stein said that he would impose the same sentence because the guideline ranges overlapped. *See United States v. Koh*, 199 F.3d 632, 642 (2d Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 2235, 147 L.Ed.2d 264 (2000). Contrary to Middlemiss' assertion on appeal, Judge Stein clearly was addressing Middlemiss when he stated this conclusion.

age, chronic hepatitis, and ongoing responsibility to care for his disabled wife. Judge Stein considered and rejected Sotiriou's request. Defendant may not appeal a district court's decision not to make a discretionary downward departure unless the court relied "on the mistaken belief that it lacked authority to depart," and there is no indication here that Judge Stein was unaware of his authority. *United States v. Martin,* 78 F.3d 808, 814 (2d Cir.1996) (quoting *United States v. Ekhator,* 17 F.3d 53, 55 (2d Cir.1994)). Sotiriou's sentencing challenge is dismissed.

Orfanos requested a downward departure based on his aberrant criminal behavior pursuant to *Zecevic v. United States Parole Commission,* 163 F.3d 731 (2d Cir. 1998). He argues that he is entitled to appeal Judge Stein's refusal to depart because the district court misapplied the Sentencing Guidelines and the totality test described in *Zecevic,* which permits a downward departure where the offense of conviction is "a short-lived departure from an otherwise law-abiding life" and lists a number of factors relevant to assessing a defendant's behavior. *See id.* at 735–36 (quotation and citation omitted). Specifically, Orfanos contends that Judge Stein was predisposed not to grant the departure and rigidly applied the factors to his case even though the list in *Zecevic* is not exhaustive. Defendant's argument is without merit. Judge Stein recognized his authority to depart, and he considered the circumstances of defendant's case in light of the case law. After discussing the *Zecevic* factors in detail and applying each one to the circumstances of Orfanos' case, Judge Stein nonetheless found the departure unwarranted. Contrary to defendant's argument, the district court did not make an error of law in analyzing the departure request, and it did not abuse its discretion in refusing Orfanos' application. The sentencing transcript amply demonstrates that Judge Stein did not apply the *Zecevic* factors in a mechanical or predetermined fashion. Defendant's sentencing appeal is denied.

## CONCLUSION

We have considered all of defendants' arguments and find them to be without merit. Defendants' convictions are affirmed in all respects.