USA CERTIFIED MERCHANTS, LLC, Jerry Mossberg and K.W. Liu Plaintiffs,

v.

Steve KOEBEL, Keith Coleman and Kentucky Derby Hosiery Co., Inc., Defendants.

No. 01 CIV. 0408.

United States District Court, S.D. New York.

May 14, 2003.

**324**

Jeffrey Daichman, Nahum Ari Kianovsky, Kane Kessler, P.C., New York, NY, for USA Certified Merchants, LLC, Jerry Mossberg, K.W. Liu, plaintiffs.

David S. Smith, Smith Campbell, L.L.P., New York, NY, for Steve Koebel.

Laura H. Rubin, Tannenbaum, Dubin & Robinson, L.L.P., New York, NY, for Keith Coleman.

Alfred W.J. Marks, Tyler J. Kandel, Emmet, Marvin & Martin, L.L.P., New York, NY, for Kentucky Derby Hosiery Co., Inc.

## DECISION AND ORDER

MARRERO, District Judge.

USA Certified Merchants, LLC ("USA Certified"), Jerry Mossberg ("Mossberg") and K.W. Liu ("Liu") (collectively "Plaintiffs") brought this action asserting claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 *et seq.*, breach of fiduciary duty, breach of contract, fraud and unjust enrichment. Defendant Kentucky Derby Hosiery, Inc. ("KDH") moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing all the claims against it. By separate motion, Defendant Steve Koebel ("Koebel"), *pro se,* moves for summary judgment dismissing the entirety of the claims alleged against him. Plaintiffs cross-move for partial summary judgment on the discrete legal issue of KDH's vicarious liability for the actions of defendant Keith Coleman ("Coleman").[1] For the reasons set forth below, KDH's motion is GRANTED in its entirety, Koebel's motion is DENIED in part and GRANTED in part and Plaintiffs' motion is DENIED.

---

1. Coleman, who is defending himself *pro se,* did not make any submissions supporting or opposing any motion for summary judgment.

# I. BACKGROUND [2]

## A. *PARTIES*

USA Certified is a New York limited liability corporation founded by plaintiffs Mossberg and Liu and defendant Koebel in June of 1998. Mossberg, Liu and Koebel were each one-third shareholders of USA Certified. USA Certified was engaged in the wholesale close-out business involving garments and related apparel. From June 1998 until he resigned on August 17, 2000, Koebel acted as the President of USA Certified, taking a monthly draw from USA Certified funds as salary, beginning at $6,000 per month and gradually increasing to $14,000 per month. Mossberg and Liu were not as actively involved in the daily operations of USA Certified as Koebel, although the level of Mossberg's and Liu's involvement in the business of USA Certified is disputed.

KDH is a Kentucky corporation engaged in the business of manufacturing and selling hosiery throughout the United States and in parts of Canada. Defendant Coleman was employed by KDH from May 1, 1995 through November 2000 as President of the KDH Duckhead Division, a sales-marketing team designed primarily to sell KDH's licensed brand of Duckhead products. Despite his title as President, KDH indicates that Coleman was never an officer or director of the company.

As President of KDH's Duckhead division, Coleman was authorized to hire independent sales representatives on behalf of KDH to assist in securing sales of Duckhead products. KDH paid independent sales representatives commissions for their services. Coleman hired Koebel to act as an independent sales representative for KDH. From approximately April 1998—prior to the founding of USA Certified in June of 1998—through November 2000, Koebel worked as an independent sales representative for the Duckhead division and received approximately $160,000 in commission payments.

## B. *FRAUDULENT SCHEME*

Plaintiffs allege that Koebel, Coleman and KDH (collectively, "Defendants") engaged in a covert fraudulent scheme to exploit USA Certified's resources by utilizing Plaintiffs' accounts, business contacts and assets to promote KDH products for their own benefit. Furthermore, Plaintiffs allege that Koebel, in implementing this scheme, neglected his business responsibilities for USA Certified by spending his time, in conjunction with Coleman, selling KDH products to the detriment of USA Certified's business.

Koebel had been employed by Coleman as an independent sales representative prior to starting USA Certified with Mossberg and Liu. A few weeks after USA Certified was founded, Mossberg and Koebel had some discussions concerning Coleman and the use of USA Certified's facilities in exchange for rent or commissions. (*See* Mossberg Dep. 152–153, Exh. E of KDH's exhibit binder.) Although KDH and Koebel attest that Mossberg also knew that Koebel was employed as a sales agent at KDH, Plaintiffs argue that they were unaware of any such arrangement.

---

**2.** The factual summary that follows derives primarily from Plaintiffs' Complaint ("Compl."), dated January 18, 2001, Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment and in Support of Cross–Motion for Summary Judgment ("Pl. Mem."), dated November 22, 2002, the Memorandum of Law in support of Defendant Kentucky Derby Hosiery Co., Inc's Motion for Summary Judgment Dismissing the Complaint, the Affidavit/Affirmation of Steven Koebel ("Koebel Aff."), dated December 11, 2002, and accompanying exhibits and affidavits. Except where specifically referenced, no further citation to these sources will be made.

Plaintiffs also allege that in around September or October 1998, upon realizing that USA Certified was not receiving revenue from KDH for KDH's use of their facilities, Mossberg instructed Koebel to desist from allowing Coleman to use USA Certified facilities and to remove all KDH samples from the premises of USA Certified. Mossberg asserts that Koebel represented to him that he would act in accordance with his instructions. Nevertheless, Plaintiffs allege that Koebel, utilizing USA Certified's facilities and resources, continued to act on behalf of KDH, without their knowledge.

Kelly Cook ("Cook") was hired by Koebel to be the sales manager for USA Certified at about the time of the inception of USA Certified. Cook resigned from USA Certified on or about August 17, 2000. Cook testified at her deposition that she believed that, to some extent, the money received by Koebel from USA Certified was to be booked as USA Certified revenue and that she was led to believe that USA Certified acted as the exclusive sales agent for KDH Duckhead products. She also believed that her compensation would in some way be benefitted from Koebel's work on behalf of KDH, as well as her own limited activity on behalf of KDH.

Koebel argues that Plaintiffs knew that he worked as a sales agent for KDH and that it was understood that his activities on behalf of KDH were separate and apart from his business activities on behalf of USA Certified. Moreover, Koebel argues that Plaintiffs knew and accepted that commissions from his work for KDH would be paid to Koebel alone. Coleman attests that he was uninformed and unaware as to what was done with the money Koebel made from KDH, but that he had met with Mossberg during June of 1998 and during that conversation Coleman told Mossberg about the relationship between KDH and Koebel. Coleman explains that

he left any resolution of the arrangement concerning Koebel's commissions from KDH to the shareholders of USA Certified.

Based on the scheme outlined above, and the various fraudulent statements and misrepresentations alleged to have been committed by Koebel, and support for such acts provided by Coleman and KDH, Plaintiffs brought claims for fraud, violations of RICO, unjust enrichment and breach of contract against Koebel, claims for RICO violations and unjust enrichment against KDH and claims for RICO violations against Coleman. KDH and Koebel move for summary judgment on all the claims against them. Coleman made no motion nor did he join in those filed by the other Defendants. Plaintiffs argue that KDH is vicariously liable for the actions of its agent, Coleman, in connection with the RICO violations alleged against it and cross-move for summary judgment as a matter of law on that discreet issue.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Rodriguez v. Hahn*, 209 F.Supp.2d 344, 346 (S.D.N.Y.2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The role of the Court is not to resolve issues of fact but, rather, "to determine as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Gibson v. Am. Broad. Companies, Inc.*, 892 F.2d 1128, 1132 (2d Cir.1989). The moving party bears the initial burden of

"informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party "must support with specific evidence his assertion that a genuine dispute as to material fact does exist," *id.* at 324, 106 S.Ct. 2548, and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).

The opposing party's showing of a genuine dispute must be grounded in concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All ambiguities and reasonable inferences drawn from the underlying facts must be resolved in the light most favorable to the party opposing the motion. *See U.S. v. One Tintoretto Painting Entitled "The Holy Family With St. Catherine and Honored Donor",* 691 F.2d 603, 606 (2d Cir.1982) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

The Court is "mindful that summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.... The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985); *accord Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998).

Furthermore, where the non-moving party will bear the burden of persuasion at trial, the moving party is entitled to summary judgment either where the evidence negates an essential element of the non-movant's claims or where there is no evidence that would permit the non-movant to establish an essential element of his or her claim. *See Farid v. Smith,* 850 F.2d 917, 924 (2d Cir.1988).

## B. *KDH'S LIABILITY FOR COLEMAN'S ACTIONS*

The allegations and evidence concerning KDH's liability in the RICO violations alleged are based on Coleman's participation in a scheme with Koebel to defraud USA Certified. Accordingly, as is undisputed by the parties, central to the analysis of KDH's potential liability for the RICO charges alleged by Plaintiffs is whether, on the evidence in the record, KDH can be held liable for Coleman's actions.

■ It is well settled that "the aim of RICO is to protect organizations from criminal infiltration, not to make them responsible parties." *Volmar Distributors, Inc. v. New York Post Co., Inc.,* 899 F.Supp. 1187, 1192 (S.D.N.Y.1995); *accord Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 164, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001); *Laro, Inc. v. Chase Manhattan Bank,* 866 F.Supp. 132, 139 (S.D.N.Y.1994); *see also, Rush v. Oppenheimer & Co. Inc.,* 628 F.Supp. 1188, 1194–1195 (S.D.N.Y.1985) ("Superimposing vicarious liability doctrines on the RICO criminality requirements would in this context permit the 'enterprise' which is the conduit for these activities, to become the defendant by way of imputation, in a transparent attempt to reach a deeper pocket than the actual violator or perpetrator of the predicate racketeering acts.")

■ Although this overriding intent of RICO is universally acknowledged, courts must also consider whether an employee's actions are sufficiently representative of the corporation as a whole so as to impli-

cate a corresponding goal of RICO: protecting the public from those who would unlawfully use a corporation as a vehicle through which unlawful activity is committed. *See Cedric,* 533 U.S. at 164–165, 121 S.Ct. 2087; *National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).

Neither the Second Circuit nor the Supreme Court have definitively settled the extent to which ordinary respondeat superior principles make a corporation legally liable under RICO for the criminal acts of its employees. *See Cedric,* 533 U.S. at 166, 121 S.Ct. 2087; *Qatar Nat'l Navigation & Transp. Co. Ltd. v. Citibank, N.A.,* 89 Civ. 0464, 1992 WL 276565, *7 (S.D.N.Y. September 24, 1992). Essentially, however, the Supreme Court has directed that a corporation can be held liable when the organization itself is being conducted as an illegitimate criminal enterprise or "in a manner detrimental to the public interest." *Cedric,* 533 U.S. at 165, 121 S.Ct. 2087 (quoting S.Rep. No. 91–617, at 82.); *accord Kovian v. Fulton County Nat'l Bank and Trust Co.,* 100 F.Supp.2d 129, 133 (N.D.N.Y.2000) ("For purposes of vicarious RICO liability, courts distinguish 'between 'aggressor' corporations that are central figures in the unlawful scheme and 'conduit' corporations that unknowingly facilitate the illegal behavior' and noted that most courts 'have declined to subject the [latter] to RICO liability.' ") (quoting *Amendolare v. Schenkers Intern. Forwarders, Inc.,* 747 F.Supp. 162, 168 (E.D.N.Y.1990)).

Following the basic principle that RICO is intended to protect and not victimize organizations, decisions in this district generally hold that "corporations may not be held vicariously liable for the actions of their employees in violation of the RICO statute 'where the plaintiff has not alleged any facts which portray the company as an active perpetrator of the fraud or a central figure in the criminal scheme.' " *Qatar,*

1992 WL 276565, at * 7 (quoting *Philan Ins. Ltd. v. Frank B. Hall & Co. Inc.,* 748 F.Supp. 190, 198 (S.D.N.Y.1990); *accord Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 351 (S.D.N.Y.1998); *Amendolare,* 747 F.Supp. at 168 ("vicarious liability under RICO is only permitted when the defendant corporation can be characterized as the 'central' or 'controlling' figure in the RICO enterprise."))

■ In order to demonstrate that a corporation is directly involved or central to the RICO scheme alleged, Plaintiffs must show that a corporate officer or director had knowledge of or was recklessly indifferent toward the unlawful activity. *See Amendolare,* 747 F.Supp. at 169; *Laro,* 866 F.Supp. at 140. Even upon such a finding, other factors, including the number of high-level employees involved, their degree of participation in the alleged scheme, as well as the extent of the corporation's benefit from the scheme, should then be considered before corporate liability is properly attributed. *See Amendolare,* 747 F.Supp. at 169; *Laro,* 866 F.Supp. at 140; *see also Dubai Islamic Bank v. Citibank, N.A.,* 126 F.Supp.2d 659, 671 (S.D.N.Y.2000).

Some courts in this Circuit have imposed RICO liability on a corporation for the acts of its employees based, at least in part, on whether the corporation itself benefitted from the scheme. *See Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York,* 808 F.Supp. 213, 236 (S.D.N.Y. 1992) ("Where the employer allegedly benefits from the predicate acts, respondeat superior liability under RICO is appropriate."); *Connors v. Lexington Ins. Co.,* 666 F.Supp. 434, 453 (E.D.N.Y.1987) ("§ 1962(c) liability may be appropriate so long as the employer/enterprise actually benefitted from the [ ] predicate acts.") This approach was adopted by the Seventh Circuit in *D & S Auto Parts Inc. v. Schwartz,* 838 F.2d 964, 967 (7th Cir.1988).

However, even under the analysis in *D & S Auto Parts,* the Seventh Circuit held that "[a]n employee violating RICO without his employer's knowledge is highly unlikely to be acting for his employer's benefit," 838 F.2d at 967, thereby incorporating the presumption that for a corporation to be held liable under RICO, an employer will most likely be aware of the wrongdoing of its employee.

■ Courts have also focused on principles of agency in determining the appropriateness of corporate vicarious liability in the RICO context. *Connors,* 666 F.Supp. at 453; *Bernstein v. IDT Corp.,* 582 F.Supp. 1079, 1083–84 (D.Del.1984) ("When conduct is proscribed by a federal statute and civil liability for that conduct is explicitly or implicitly imposed, the normal rules of agency law apply in the absence of some indication that Congress had a contrary intent."); *see also Amendolare,* 747 F.Supp. at 168–171 (agency one of a number of principles considered in determining vicarious liability); *Kovian,* 100 F.Supp.2d at 133 (finding that high ranking officers of a bank could not implicate the Bank's liability because they were acting outside the scope of their employment). However, under agency principles, for liability to be attributed to the corporation, an agent must be acting within the scope of his employment, typically meaning that the corporation must have been aware of the scheme or artifice to defraud. *Kovian,* 100 F.Supp.2d at 133; *see also* Restatement (Second) of Agency § 219 (1958).

■ The weight of the authority in this District supports imposing vicarious liability on corporations in RICO actions based on the centrality of the role played by the corporate entity, a test which is therefore crucial to this Court's consideration in the

case at hand. In this case, Coleman is not an officer or director of KDH, which Plaintiffs do not contest, nor have the Plaintiffs alleged substantial participation by other officers or employees of KDH in any fraudulent scheme. (*See* Affidavit of William H. Nichol, Jr. ("Nichol Aff.") in Support of KDH's Motion for Summary Judgment, dated October 22, 2002, at ¶ 6). There are also no allegations in the Complaint, nor is there any proof in the record, that anyone else at KDH, most importantly an officer or director, was informed about the allegedly fraudulent scheme. Coleman's actions, as framed by Plaintiffs, likely benefitted KDH, the absolute minimum for imposing liability on a corporation for the acts of its employees or agent, *see Volmar,* 899 F.Supp. at 1193, but there is no evidence in the record here that KDH was aware that such benefits from Koebel's sales were in any way related to a fraudulent scheme. Accordingly, KDH is not subject to liability from any alleged fraudulent activities by Coleman because Plaintiffs have failed to present sufficient evidence of the centrality of KDH's role in the alleged scheme by pointing to the actions of a single KDH employee, even to one characterized as a "high level staff" person. *See Qatar,* 1992 WL 276565, at *5 ("[i]n order to create a strong inference that Citibank was involved, the plaintiff must allege some higher level of complicity than merely the participation of [an Assistant Vice–President and Manager of Citibank's branch office in Bronxville] and the use of Citibank equipment to perpetrate the scheme.")

However, even to the extent that agency principles would otherwise apply in this case, they are of no avail to Plaintiffs in implicating KDH in violations of RICO.[3]

---

**3.** Plaintiffs' reference to antitrust cases that have endorsed agency principles in that context is misplaced because of the different legislative intents between RICO and antitrust

statutes. (*See* Pl. Mem. at 37–39.) Whereas antitrust law and statutes are ultimately intended to prevent corporations from exerting

Fundamentally, as will be discussed at length in the next section, the Court finds that Plaintiffs have not produced evidence, sufficient to survive summary judgment, demonstrating that Coleman's actions were fraudulent or that he conspired or schemed with Koebel to defraud USA Certified.[4] Therefore, the Court finds that although Coleman's actions, as alleged by Plaintiffs, can fairly be attributed to KDH under general principles of agency, since they were in fact within the scope of his employment at KDH, Coleman's actions nonetheless do not implicate him or KDH in RICO violations. Coleman's conduct, as alleged, for the most part, reflected legitimate actions on the part of an employee of KDH in promoting KDH's business. In any event, whether legitimate or not, on the record before it, there is insufficient proof of Coleman's involvement in a fraudulent scheme to deprive USA Certified of its business for the Court to allow the RICO claims against Coleman or KDH to go to a jury.

## C. *RICO CLAIMS AGAINST COLE-MAN/KDH*

### 1. *18 U.S.C. § 1962(a) and (b)*

■ Plaintiffs assert four separate claims of RICO violations against Coleman and KDH. Based on even the most liberal reading of the Complaint, two of the four claims alleged fail as a matter of law, as against all Defendants, for failure to state a claim. Title 18 U.S.C. § 1962(a) and (b) provide, in relevant part, that

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

■ The "enterprise" referred to in these subsections of RICO must be something acquired or invested in through illegal activities or by the use of money obtained from illegal activities. *See Scheidler*, 510 U.S. at 259, 114 S.Ct. 798. The Supreme Court has further characterized the enterprise described in these subsections as "the victim of unlawful activity ... that represents a property interest and may be acquired." *Id.* In essence, these RICO statutory elements aim at preventing the use of racketeering money to acquire legitimate companies. In contrast to the enterprise in subsection (c) of the RICO statute, which will be considered in the next section, the enterprise in subsections (a) an (b) is not

---

monopolizing anticompetitive force, the language of RICO is clearly aimed at individual "racketeers" infiltrating legitimate business. *See Cedric*, 533 U.S. at 166, 121 S.Ct. 2087 ("Neither is it inconsistent with antitrust law's intracorporate conspiracy doctrine; that doctrine turns on specific antitrust objectives."); *see also Qatar*, 1992 WL 276565, at *8.

**4.** Although Coleman does not move for summary judgment, the Court determines herein whether there is sufficient on this record evidence for a reasonable jury to find that Coleman participated in the fraudulent scheme alleged by Plaintiffs, both as an alternate basis for rejecting Plaintiffs' claims that KDH should be liable for Coleman's wrongful actions, and to assess the propriety of the RICO violations alleged against Koebel discussed in part II.D below.

intended to be the vehicle through which a pattern of racketeering is undertaken, but a separate, legitimate entity purchased through moneys raised through racketeering. *Id.*

 Therefore, Plaintiffs must allege a use or investment injury that is distinct from any injury resulting from the racketeering predicate acts themselves. *See Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1063 (2d Cir.1996), *vacated in part on other grounds by,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Ouaknine v. MacFarlane,* 897 F.2d 75, 82–83 (2d Cir.1990); *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 113 F.Supp.2d 345, 383–384 (S.D.N.Y. 2000). "Where investment of racketeering proceeds back into the same RICO enterprise is alleged, the injuries stem proximately not from the investment, but from the predicate acts that make up the racketeering activity." *Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 349 (E.D.N.Y. 2000); *see also Kaczmarek v. Inter. Bus. Machs. Corp.,* 30 F.Supp.2d 626, 628 (S.D.N.Y.1998) ("Mere reinvestment of racketeering income into the same racketeering enterprise that generated the income 'does not satisfy the Second Circuit's holding in *Ouaknine* 'because investment of the proceeds from the pattern of racketeering for general operations is too attenuated a causal connection to satisfy section 1962(a).' ")

In this case, as alleged in the Complaint, Plaintiffs argue that the income derived from the alleged fraudulent scheme was invested in and obtained an ownership interest in the "Kentucky Derby Enterprise," which is the same enterprise alleged to have been the vehicle through which Defendants engaged in the unlawful predicate acts. (Compl.¶¶ 46, 57.) Furthermore, the injuries alleged in the third and fourth claims against Defendants are alleged to have been a proximate result of the racketeering predicates, not a distinct injury. (*Id.* ¶¶ 53, 58.) Plaintiffs thereby do not appropriately allege a separate injury from Defendants' investment of income gained through racketeering activity into an "enterprise". Accordingly, as a matter of law, Plaintiffs third and fourth claims can not be asserted against any of the Defendants since Plaintiffs do not assert a valid claim.[5]

### 2. 18 U.S.C. § 1962(c) and (d)

 To state a RICO claim under § 1962(c), a plaintiff must plead seven elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly to conduct or participate in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce. *See* 18 U.S.C. § 1962(c); *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983); *The Jordan (Bermuda) Investment Co. Ltd. v. Hunter*

---

**5.** The Court is unpersuaded by Plaintiffs' argument that the injury requirements of 18 U.S.C. § 1962(c) specified in *Sedima v. Imrex Co., Inc.,* 473 U.S. 479, 494, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), should apply to 18 U.S.C. § 1962(a) and (b) as well. The Second Circuit has expressly held that the requirements for demonstrating injury and for asserting a claim under § 1962(a) are distinct from § 1962(c), and that only in subsection (c) is the RICO injury alleged properly based on the predicate acts. *See Ouaknine,* 897 F.2d at 83;

*see also Vista Co. v. Columbia Pictures Industries, Inc.,* 725 F.Supp. 1286, 1299 (S.D.N.Y. 1989) ("Though the *Sedima* Court found that there was no requirement under §§ 1962 & 1964(c) of a distinct 'racketeering injury,' this holding has no bearing on what constitutes a violation § 1962(a).") The investment injury pertains to 18 U.S.C. § 1962(b) as well. *See Discon,* 93 F.3d at 1063; *Black Radio Network, Inc. v. NYNEX Corp.,* 44 F.Supp.2d 565, 579 (S.D.N.Y.1999).

*Green Investments Ltd.,* 154 F.Supp.2d 682, 690 (S.D.N.Y.2001).

The RICO statute defines "racketeering activity" as comprising specific enumerated crimes, including mail fraud and wire fraud, as is alleged in this case. 18 U.S.C. § 1961(1)(B). In order to bring a valid civil claim under RICO, Plaintiffs must prove that Defendants committed two predicate acts of "racketeering activity." *Volmar,* 899 F.Supp. at 1190. A RICO claim alleging mail or wire fraud must prove that the defendants engaged in "(1) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *U.S. v. Autuori,* 212 F.3d 105, 115 (2d Cir.2000). A plaintiff must prove that the defendant knowingly participated in the scheme and that the misrepresentations were material. *Id.; S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir. 1996). The predicate mail or wire communications need not themselves contain fraudulent communications, but instead must be "incident to an essential part of the scheme," which itself has a fraudulent and deceptive purpose. *Schmuck v. United States,* 489 U.S. 705, 711, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Furthermore, where more than one defendant is charged with fraud, it is necessary for a plaintiff to particularize and prove each defendant's participation in the fraud and each defendant's enactment of the two necessary predicate acts. *See DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *Lakonia Management Ltd. v. Meriwether,* 106 F.Supp.2d 540, 550 (S.D.N.Y.2000); *Moeller v. Zaccaria,* 831 F.Supp. 1046, 1056 (S.D.N.Y.1993).

First, KDH argues that Plaintiff's RICO claims should be dismissed because they are not pled with adequate particularity in accordance with Fed. R.Civ.P. 9(b). It is well settled that when a RICO plaintiff alleges that one of the predicate acts is fraud, the predicate acts must be pled with particularity. *See Anatian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999); *Plount v. American Home Assurance Co.,* 668 F.Supp. 204, 207 (S.D.N.Y.1987). Generally, pleading fraud with particularity requires the plaintiff to " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Anatian,* 193 F.3d at 88 (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994)); *see also Ouaknine,* 897 F.2d at 79; *In re Sumitomo Copper Litigation,* 995 F.Supp. 451, 455 (S.D.N.Y.1998). However, in cases in which the plaintiff claims that the mails or wires were used in furtherance of a master plan to defraud, as opposed to cases in which the mailings themselves are alleged to be fraudulent, some courts have held that a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b). *See Sumitomo,* 995 F.Supp. at 456. To a certain extent, the Complaint does not meet this standard of particularity, even as to the details of the fraudulent scheme, especially with respect to Coleman and KDH.

Plaintiffs argue in response that a Rule 9(b) objection is misplaced and irrelevant at the summary judgment stage of the proceedings. (Pl. Mem. at 17 n. 9.) However, waiver of the 9(b) particularity defense occurs only if a defendant fails to raise it as an affirmative defense in his answer or in a motion to dismiss. *See Todaro v. Orbit Int'l Travel, Ltd.,* 755 F.Supp. 1229, 1234 (S.D.N.Y.1991) (defendants waive objection to fraud claims because of failure to raise a Rule 9(b) objection in their answer or in a motion prior to

summary judgment); *United Nat'l Records, Inc. v. MCA, Inc.*, 609 F.Supp. 33, 38–39 (N.D.Ill.1984). In this case, the failure to plead with particularity was raised as an affirmative defense in KDH's Answer to the Complaint, dated May 3, 2001. Nonetheless, since KDH has waited until the close of discovery to move for dismissal of the Complaint, no purpose would be served by asking Plaintiffs to replead at this point. Rather, because the Court has before it the depositions, affidavits and documentary evidence obtained during discovery, and all the corresponding details and particulars contained in these documents—which presumably would be incorporated by Plaintiffs upon leave to replead—KDH's motion will be decided under the summary judgment standard based on the evidence now before the Court. *See Nakano v. Sadock,* No. 98 Civ. 0515, 2000 WL 680365, at *8 (S.D.N.Y. May 25, 2000).

■■■ The central issue facing the Court is whether, based on the allegations and the factual submissions in the record, Plaintiffs have produced sufficient evidence of KDH's and Coleman's involvement in the alleged fraudulent scheme. To produce sufficient evidence, Plaintiffs must prove all elements of the predicate wire fraud charges against Coleman. Namely, Plaintiffs must provide sufficient evidence that: (1) Coleman participated in a scheme to defraud; (2) Coleman acted "with knowledge" that the use of the mails or wires would follow in the ordinary course of business; and (3) the mailing or the use of wires was for the purpose of executing the scheme or fraud alleged. *See Sumitomo,* 995 F.Supp. at 455 (citing *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989) and *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). Most significantly, Plaintiffs have the burden of demonstrating "scienter": that Coleman had the specific intent to defraud. *See Beck v. Manu-* *facturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987) (citations omitted).

■■■ Plaintiffs have not produced sufficient evidence to create a factual issue as to Coleman's knowing involvement in a scheme to defraud USA Certified. "Although Rule 9(b) provides that intent and 'other conditions of mind' may be averred generally, plaintiffs must nonetheless provide some factual basis for conclusory allegations of intent." *Id.* (citations omitted). Furthermore, "[t]hese factual allegations must give rise to a "strong inference" that the defendants possessed the requisite fraudulent intent." *Id.* Intent is commonly demonstrated by specifying a motive for committing fraud, *i.e.,* that the defendant benefitted from the alleged fraud, and an opportunity to do so. If motive is not apparent, scienter can be demonstrated through a showing of conscious behavior by the defendant. *Id.*

Here, while it is uncontested that Coleman and KDH benefitted from hiring Koebel as a salesperson, Plaintiffs indicate no benefit Coleman or KDH received or could have received from defrauding the Plaintiffs in this case. KDH and Coleman would have made the same amount of money from Koebel's efforts had the commissions paid to Koebel been relinquished to USA Certified or had Koebel's activities been fully disclosed to Mossberg and Liu. Rather, the evidence suggests that only Koebel stood to benefit from the alleged fraudulent scheme. Therefore, no benefit can be ascribed to KDH or Coleman from keeping Koebel's services on behalf of KDH hidden from Koebel's partners.

Coleman testified at his deposition that he believed that Mossberg knew that Koebel received commissions from KDH, because he told him so directly at a meeting. (Coleman Dep. at 67–71, attached as Exh. V to the Affidavit of Nahum A. Kianovsky ("Kianovsky Aff."), dated November 22,

2003.) Coleman also testified that he knew nothing of the business arrangement of USA Certified or about whether Koebel was permitted by the partnership to work for KDH separate and apart from his responsibilities at USA Certified. (*Id.* at 57–58.) Coleman further explained that he had no knowledge of the arrangement between Koebel and USA Certified concerning the commissions paid to Koebel by KDH.[6] (*Id.* at 84–86.) Plaintiffs produce no evidence to rebut this testimony, but simply refute it with conclusory allegations. In fact, the evidence indicates that Coleman had no incentive or responsibility to insure that Koebel's actions with regard to USA Certified were handled appropriately. Accordingly, because Plaintiffs have shown neither direct evidence of Coleman's knowledge of the fraudulent scheme or intent to defraud, nor any benefit that would ensue to Coleman or KDH from the scheme, Plaintiffs have not sufficiently carried their burden of raising a factual issue as to the element of intent required to prove a fraudulent scheme with regard to Coleman and KDH.

■■■■ Moreover, in order to prove a fraudulent scheme of any type, for both common law fraud or RICO fraud schemes, it is necessary to show "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–971 (2d Cir. 1987); *accord Morin v. Trupin*, 711

F.Supp. 97, 105 (S.D.N.Y.1989) ("Where the fraudulent scheme is premised upon inadequate pleading of common law fraud, the allegations of mail and wire fraud must also fail."); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992) (to establish a causal connection between misrepresentation and fraud, defendant's misrepresentations must have been relied upon.)

As against Coleman and/or KDH, the Plaintiffs do not claim common law fraud in the Complaint, but rather argue only that they participated in a fraudulent scheme in violation of RICO. In delineating the actions that constitute Coleman's and KDH's part in the alleged fraudulent scheme, Plaintiffs assert, in a conclusory manner, that "Koebel and Coleman contrived a scheme to defraud plaintiffs," that sales of KDH products were "secretly" made, and that Koebel and Coleman kept the sales commissions hidden from USA Certified. (Complaint ¶¶ 10, 12, 16.) Even assuming that such broad allegations against Coleman and KDH are sufficient to satisfy the specificity requirements of Rule 9(b), on this summary judgment motion record before the Court, Plaintiffs have not been able to demonstrate adequate evidence of Coleman's or KDH's participation in a fraudulent scheme to allow the issue to go to trial.

Besides conclusory allegations that Koebel and Coleman fraudulently conspired based on the fact that: (1) Koebel acted as a sales agent for KDH, (2) without informing his partners at USA Certified, (3) with-

---

**6.** The fact that commissions from KDH sales were paid directly to Koebel and not to USA Certified, without further proof of intent, cannot establish scienter with regard to Coleman or KDH. First, Plaintiffs have presented no evidence that Coleman was aware that Koebel's partners objected to Koebel's work for KDH. Second, the record shows that it was not Coleman's responsibility to monitor the proper allocation of the commissions he paid Koebel—he was entitled to assume that Moss-

berg was aware that USA Certified was not receiving the checks directly because they had always been made out to Koebel alone. Third, Koebel worked on behalf of KDH in his own capacity prior to the inception of USA Certified and, as the President of USA Certified, Koebel had the responsibility to either request that the checks be distributed directly to USA Certified or to deal with any proper arrangements on USA Certified's behalf.

out relinquishing his profits to USA Certified, and (4) spending time and resources belonging to USA Certified on KDH business, and (5) that Coleman hired Koebel at KDH and would, at times, work in conjunction with him, Plaintiffs produce almost no evidence directly implicating Coleman in the scheme. What evidence they do provide as to Coleman's participation in the alleged scheme is insufficient to establish fraud because nothing attributed to Coleman could reasonably be considered a misrepresentation in light of Plaintiffs' failure to produce any evidence that Coleman was aware of any scheme.

Coleman's statements as alleged by Plaintiffs simply do not amount to misrepresentations based on the evidence in the record. Ultimately, the injury alleged is that Koebel wrongfully and deceitfully sold KDH products for his own benefit using USA Certified's time and resources, thereby detrimentally affecting USA Certified's business. Mossberg asserts that he told Koebel, after discovering that USA Certified was not making a profit from its activities with KDH, to desist its dealings with KDH. (Mossberg Dep. at 154, 155.) However, there is no evidence that Coleman or KDH knew of Mossberg's desire for USA Certified to have no contact with KDH and therefore no proof that Coleman or USA Certified acted fraudulently. Further proof offered by Plaintiffs concerns Koebel's efforts to hide his KDH related activities from USA Certified and Koebel's improper handling of USA Certified business. There is no evidence to indicate that these alleged improprieties involved Coleman or KDH.

Cook, a former employee of USA Certified, testified that Coleman and Koebel told her that USA Certified would be the "exclusive off-price agents for Duckhead Hosiery" and led her to believe that sales of KDH products would be attributed to USA Certified. (See Cook Dep., attached

as Exh. G. to Defendant's exhibit binder, at 25–31.) Cook also indicates that Coleman provided her with KDH business cards. (Id. at 412–413.) Plaintiffs assert that "Coleman first visited the USA showroom on the pretext that he was interested in doing business with USA Certified," and proposed an arrangement whereby USA Certified would be compensated for use of USA Certified facilities. (Pl. Mem. at 8.) This evidence alone does not provide material support that Coleman knew or was involved in Koebel's decision or alleged scheme not to relinquish the commissions paid by KDH to the benefit of USA Certified or to hide Koebel's relationship with KDH from Plaintiffs.

It is not disputed that KDH paid Koebel for his services, but Plaintiffs offer no evidence that KDH or Coleman had any knowledge, part in, or even responsibility to find out how that money was allocated between the USA Certified partners, or concern themselves with the arrangements that the USA Certified partners had made regarding Koebel's efforts on behalf of KDH. The evidence supports nothing beyond the proposition that Coleman had openly gone to Mossberg and informed him of his interest in collaborating with USA Certified and that Coleman had hired Koebel, whether independently or as an agent of USA Certified, to sell KDH products. In fact, Mossberg admits at his deposition that he was aware that Koebel provided services to KDH from around the time of USA Certified's formation. (Mossberg Dep. at 152–153.) In sum, the Court concludes that Plaintiffs can not prove, based on the evidence they have submitted, that Coleman had any part in such a scheme or that he made any misrepresentations relied upon by Plaintiffs.

Plaintiffs assert that the fact that Coleman did not have a fiduciary duty to USA Certified does not mean that Coleman can

not be found to have participated in a fraudulent scheme to deprive Plaintiffs of the right to honest services of Koebel. (Pl. Mem. at 21.) In *United States v. Middlemiss,* the Second Circuit explained that a scheme to deprive an employer of honest services does not "require an actual fiduciary relationship between the individual who defendant believes provides services and the entity being defrauded of honest services." 217 F.3d 112, 120 (2d Cir.2000). Nonetheless, it is still necessary that the scheme contemplate more than the provision of only honest services. *Id.* In this case, because Plaintiffs have not provided evidence that Coleman was involved in fraudulent or wrongful activity, but rather, as conveyed by Plaintiffs' allegations, his actions were essentially those normally carried out as an employee of KDH promoting his business, Plaintiffs must show that something more was owed by him to USA Certified in order to implicate him in the alleged fraudulent scheme. Therefore, since Coleman had no fiduciary duty or other responsibility to inquire into the business of USA Certified, Plaintiffs have not sufficiently implicated Coleman in the alleged scheme attributed to Koebel.

Similarly, Plaintiff's deficient basis for including Coleman or KDH as members of a scheme to defraud is apparent from the predicate acts of mail and wire fraud alleged in the Complaint. In pleading predicate acts of mail and wire fraud, Plaintiffs refer to "orders and sales documents relating to the sales of KDH hosiery to buyers who believed they were purchasing the merchandise through USA Certified and relating to sales which were wrongfully diverted from USA Certified for the benefit of Kentucky Derby." (Compl.¶ 47.) Such alleged acts of fraud conducted by mail or wire solely involved Koebel and the purchasers, not Coleman or KDH. Although some cases have held that pleading with specificity concerning acts of mail and wire fraud is not essential where the plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud, a detailed description of the underlying scheme and the defendants' participation in that scheme is necessary to establish mail and wire fraud. *See Sumitomo,* 995 F.Supp. at 456. However, the specific fraudulent statements set forth in the Complaint surrounding the fraudulent scheme alleged all involve statements or actions by Koebel, only tangentially indicating in one instance (Compl.¶ 22) that Coleman was involved. (Compl.¶¶ 17–26.) But such tangential involvement on the fringe of a scheme, without more direct evidence of knowledge of the scheme, cannot support a claim of fraud against Coleman and KDH. The particularity of the scheme as it relates to Coleman and KDH is therefore insufficient, based on the pleadings and the evidence in the record, to establish Coleman's and KDH's participation in a fraudulent scheme under the mail and wire acts.

Lastly, the reliance element of a RICO claim for damages is lacking as to any alleged misrepresentation by Coleman or KDH. Whatever Coleman may have said to Cook about the arrangement between KDH and USA Certified, Mossberg testified that he never discussed the arrangement between Koebel and KDH with anyone at KDH, including Coleman. (Mossberg Dep. at 163, 175.) The other plaintiff, Liu, was not involved in the daily business of USA Certified on a regular basis, nor does he indicate that he relied on anything done or said by Coleman or anyone else at KDH. Accordingly, Plaintiffs could not have reasonably relied on any fraud committed by KDH or Coleman to establish proximate cause of injury against them.

■ Moreover, since there is insufficient evidence of their participation in the alleged fraudulent scheme, Coleman and

KDH can not be held liable for 18 U.S.C. § 1962(d) because, having failed to produce sufficient evidence of their participation in a fraudulent scheme, Plaintiffs can not demonstrate that Coleman and KDH conspired to breach a provision of RICO.

In sum, KDH and Coleman can not be held liable for mail fraud or wire fraud because there is insufficient evidence in the record of their intent to defraud USA Certified, of their knowing participation in a scheme to defraud USA Certified, or of predicate acts or misrepresentations made by Coleman or KDH and relied upon by Plaintiffs. Without sufficient proof of those Defendants' knowledge and participation in a scheme to defraud, Plaintiffs' RICO claim against KDH and Coleman must fail as a matter of law since no "racketeering activity" can be claimed.

### D. UNJUST ENRICHMENT CLAIM AGAINST KDH

■ Plaintiffs ninth claim, alleging unjust enrichment against KDH, must be dismissed. Plaintiffs allege that KDH has benefitted from an unknown amount, but no less than $1,000,000, "from its agreement with Koebel that he would use USA Certified's resources and customer lists to work on behalf of it rather than USA Certified." (Compl.¶ 76.) As explained above, Plaintiffs have not provided sufficient evidence to create an issue of material fact to be determined by a jury as to Coleman's or KDH's participation in a scheme to defraud USA Certified. Therefore, Plaintiffs unjust enrichment claim must also be dismissed.

### E. RICO CLAIMS AGAINST KOEBEL

■ In his motion for summary judgment, Koebel argues that all the RICO claims against him should be dismissed because the fundamental premise of the complaint is false since his part-time work on behalf of KDH was fully disclosed.

However, the evidence in the record sufficiently supports a material factual dispute as to Plaintiffs' knowledge of Koebel's activity to create a triable issue to be determined by the jury. Specifically, Mossberg firmly declares that he was unaware that Koebel acted as an independent sales representative for KDH, believing instead that KDH products' presence at USA Certified were related to the provision of services by USA Certified to KDH and that USA Certified would be compensated. (See Mossberg Dep. at 178, 198, 250–253.) Moreover, Mossberg testified that two to three months after the founding of USA Certified, once he realized that USA Certified was not being compensated for its services, he requested that Koebel remove KDH products from USA Certified and that Koebel indicated that he would end USA Certified's relationship with KDH. (Id. at 154–156.)

Furthermore, Koebel argues that the Complaint should be dismissed because there was no agreement between him and Plaintiffs that he would not engage in any business other than USA Certified and therefore that is was not improper for him to act as a sales representative for KDH at the same time that he performed his duties on behalf of USA Certified. In opposition, Mossberg asserts that although there was no written agreement prohibiting Koebel from working on behalf of KDH, Koebel was prohibited by oral agreement among the members of USA Certified and his fiduciary responsibilities under New York law from working for KDH in a manner that would compromise the business of USA Certified, most centrally by expending USA Certified resources for the purpose of selling KDH hosiery, which sales would not benefit USA Certified. (See Mossberg Dep. at 145–147; Affidavit of Jerry Mossberg ("Mossberg Aff."), dated Nov. 22, 2002, ¶¶ 3, 4, 6.) Although the alleged oral agreement between Plaintiffs

and Koebel, as described by Mossberg in his deposition, is based on his rather vague understanding of the requirements of Koebel's position as the active partner in USA Certified, (Mossberg Dep. at 145–147), Mossberg's representations concerning his understanding of his agreement with Koebel—coupled with the fact that Koebel was the President and general manager of USA Certified, and was the only partner who received a monthly draw from USA Certified, as well as payment for his car, expenses and health insurance—could lead a reasonable jury to find that there was an agreement between Mossberg and USA Certified that Koebel would work exclusively for USA Certified. (Mossberg Aff. ¶¶ 5, 6.)

Finally, Koebel argues that Plaintiffs can not prove that his activities caused their damages. Rather, he argues that the decline in USA Certified's business in 2000 was caused by unrelated business reasons deriving from USA Certified's "inability" to do business with five to six vendors with which it had done 75 percent of its business in 1999. (*See* Koebel Aff. at 4.) Plaintiffs insist that Koebel's improper undertaking of an independent source of income did affect and detract from his performance as President of USA Certified. Regardless of Koebel's arguments concerning the weight of the evidence with regard to these disputes, all three of these material issues entail differences as to matters of fact between the parties. As to each disputed issue, a jury must assess the evidence and credibility of the parties and determine the facts.

In light of the central factual disputes identified above, which issues are not intended to be exclusive, there is sufficient basis for a factual determination, by a jury, as to Plaintiffs' sixth claim against Koebel for violation of RICO, 18 U.S.C. § 1962(c), for his participation in the conduct of USA Certified through a pattern of racketeering activity. However, as indicated above, Plaintiffs third and fourth claims against Koebel, KDH and Coleman, alleging violations of § 1962(a) and (b), fail as a matter of law based on Plaintiffs' allegations as against all Defendants. Furthermore, Plaintiffs seventh claim for relief concerning a conspiracy to violate RICO in violation of 18 U.S.C. § 1962(c) must be dismissed because the Court has found that evidence of Coleman's and KDH's participation in the scheme, the alleged co-conspirators, is insufficient to establish an issue of material fact. Lastly, Plaintiffs fifth claim must be rejected for failure to produce sufficient evidence of the enterprise named in that claim under 18 U.S.C. § 1962(c), specifically that KDH–Coleman–Koebel constituted a group of persons joined together for the purpose of implementing the scheme alleged by Plaintiffs. (*See* Pl. Mem. at 26–27.)

Plaintiffs have put forth sufficient evidence in support of their RICO claim pursuant to 18 U.S.C. § 1962(c), naming USA Certified as the enterprise, to create a factual issue to be tried. First, there is sufficient evidence in the record to support a finding that Koebel committed the two necessary predicate acts of wire fraud. The necessary elements for establishing wire fraud are: (1) the forming of a scheme to defraud, and (2) the use of mail or wire communications in furtherance of the scheme to defraud. *See United States v. Trapilo,* 130 F.3d 547, 551 (2d Cir.1997); *Sumitomo,* 995 F.Supp. at 456. Furthermore, the "scheme to defraud need not contemplate the use of the mails as an essential part of the scheme as long as the mailing is incident to an essential part of the scheme." *Middlemiss,* 217 F.3d at 120 (quoting *United States v. Altman,* 48 F.3d 96, 102 (2d Cir.1995)). In this case, there is sufficient evidence that Koebel, by allegedly not disclosing his involvement with KDH to Mossberg and Liu, using USA

Certified facilities and resources to benefit his work for KDH, representing to Mossberg that unpaid services USA Certified had provided to KDH would be stopped, and by not sufficiently devoting himself fully to his duties for USA Certified, as he allegedly committed to do, engaged in a scheme to defraud Plaintiffs and to deprive them of his honest services. *Sumitomo,* 995 F.Supp. at 456.

Second, there is sufficient evidence that the fraudulent scheme included sufficient predicate acts under RICO to be considered racketeering. The Second Circuit has held that the RICO "pattern" requirement may be satisfied by predicate acts that further a single scheme. *United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir.1989). In this case, in acting as a salesperson for KDH while simultaneously rendering services to USA Certified, Koebel certainly would have contemplated using the mail and wires to enable his KDH business in more than two instances. Plaintiffs supply evidence concerning a number of different activities Koebel engaged in that are alleged to have improperly used USA Certified's facilities on behalf of Koebel's position at KDH in furtherance of the alleged fraudulent scheme, including: (1) allowing Coleman to use USA Certified facilities and staff, including allowing displays of KDH products at USA Certified; (2) advising USA Certified's clients that USA Certified acted as an exclusive agent for KDH labels; (3) allowing KDH products to be displayed at USA Certified's booths at off-price specialty shows without collecting any remuneration for USA Certified; (4) soliciting orders of KDH products from USA Certified's customers under the false representation that he was selling the KDH products on behalf of USA Certified; and (5) conducting KDH sales business while on business trips which he billed to USA Certified.

Furthermore, Koebel allegedly engaged in a number of acts of misrepresentation intended to conceal his activities from Mossberg and Liu, including instructing KDH employees to send faxes concerning KDH business to Koebel's home, rather than to USA Certified. In fact, Koebel himself indicates that he can not remember whether he instructed anyone to keep his activities for KDH hidden from Mossberg and Liu. (*See* Koebel Dep., attached as Exh. U to Kianovsky Aff., at 175.) These allegedly fraudulent acts would have reasonably included the use of mails and/or wires within the ordinary course of business. *See U.S. v. Slevin,* 106 F.3d 1086, 1089; *Middlemiss,* 217 F.3d at 112; *Sumitomo,* 995 F.Supp. at 456. Therefore, Plaintiffs have provided enough evidence of the predicate racketeering activity. Indeed, Plaintiffs have produced as exhibits copies of documents faxed or wired in furtherance of Koebel's alleged scheme. (Kianovsky Aff. Exhs. B, C, D, Y, GG.)

█ In addition, on this record, a jury could reasonably find that Koebel acted through an "enterprise". In order to establish the enterprise element of a racketeering charge, the Plaintiffs must show a group of persons associated together for a common purpose of engaging in a course of conduct. *Pavlov v. The Bank of New York Co., Inc.,* 25 Fed. Appx. 70, 70–71 (2d Cir. Jan.14, 2002). The Supreme Court has instructed that "[a] corporate employee who conducts the corporations's affairs through an unlawful RICO 'pattern of activity' uses that corporation as a vehicle whether he is or is not the sole owner." *Cedric,* 533 U.S. at 163, 121 S.Ct. 2087. Accordingly, as alleged by Plaintiffs, USA Certified served as an enterprise through which Koebel could have engaged in the alleged unlawful activity.

█ Lastly, a pattern of RICO activity could be found by a reasonable jury in this

case. To establish a pattern of RICO activity, predicate acts must be sufficiently continuous to satisfy close-ended or open-ended continuity standards. *See H.J. Inc.,* 492 U.S. at 241–242, 109 S.Ct. 2893 (" 'Continuity' is both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.")

In order to show close-ended continuity, a plaintiff must establish a "series of related predicates extending over a substantial period of time." *H.J. Inc.,* 492 U.S. at 230, 109 S.Ct. 2893; *see also Beauford v. Helmsley,* 865 F.2d 1386, 1391 (2d Cir. 1989) ("What is required is that the complaint plead a basis from it could be inferred that the acts of racketeering activity were neither isolated nor sporadic.") The Second Circuit has held that predicate acts lasting at least two years may satisfy the "substantial period of time" requirement. *See Metromedia,* 983 F.2d at 369; *Moss,* 719 F.2d at 22.

In this case, Koebel admits that he worked for KDH from the time of the founding of USA Certified in June 1998 through his resignation in August 2000. Plaintiffs allege that they were never informed of the nature of Koebel's activities on behalf of KDH, and that even before Mossberg instructed Koebel to refrain from permitting KDH from using USA Certified facilities and services, he was not aware that USA Certified would not be compensated for USA Certified's and Koebel's actions on behalf of KDH.[7] Accordingly, based on Plaintiffs allegations and Mossberg's testimony in support of those allegations there are potentially 26 months of purported racketeering activity that a jury could consider, which has been held to be a sufficiently substantial time period to establish a pattern of racketeering. *See Metromedia,* 983 F.2d at 369; *Moss,* 719 F.2d at 22. Accordingly, Plaintiffs can establish a sufficiently long time-period to establish closed-ended continuity as required by RICO.[8]

However, Plaintiffs can not show open-ended continuity. It is well settled that in order to establish open-ended continuity "the plaintiff need not show that predicates extended over a substantial period of time but show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229, 242 (2d Cir.1999). While a threat of continuing criminal activ-

---

**7.** The fact that Mossberg admits that at sometime in 2000 he was shown an IRS Form 1099 reporting Koebel's income from KDH, and that at that point—around the end of April or beginning of May 2000 (the fax of the Form 1099 was received at USA Certified's office on April 28, 2000)—he was alerted to Koebel's activities on behalf of KDH (Mossberg Dep. at 188), does not curtail the extent of the duration the jury may consider in determining whether the substantial period of time requirement for a RICO violation is sufficiently demonstrated by Plaintiffs. Mossberg testified that he did not confront Koebel immediately because a large amount of inventory had recently been ordered and he needed Koebel to continue to work until the inventory was depleted. (Mossberg Dep. at 188–189.)

The jury can consider whether the fraud continued from May through August due to the fact that inventory had already been ordered and Mossberg might reasonably not have been able to stop the effects of Koebel's alleged fraudulent behavior immediately upon learning of his activities on behalf of KDH.

**8.** Plaintiffs allege that the racketeering activity occurred for 29 months, from the time Koebel first approached Mossberg in March 1998 until August 2000. However, since the scheme as alleged could not have been implemented, incorporating requisite predicate acts, until USA Certified was formed, 26 months is the appropriate outside range in which the predicate acts could have been implemented.

ity is presumed where the enterprise itself is engaged in the business of the racketeering activity, where the enterprise is a legitimate business, there must be evidence that the predicate acts were likely to continue. *See H.J., Inc.*, 492 U.S. at 242–243, 109 S.Ct. 2893; *Cofacredit*, 187 F.3d at 243.

Here, Plaintiffs can not demonstrate open-ended continuity because Koebel himself retired in August 2000, thus making it impossible for him to continue to carry out his scheme through USA Certified. Similarly, USA Certified is no longer engaging in business due to the heavy losses it incurred since 2000 (Mossberg Dep. at 97.), further preventing any possible fear of continued fraudulent activity. *See Hunter Green Investments*, 154 F.Supp.2d at 694; *GICC Capital Corp. v. Technogy Finance Group*, 67 F.3d at 463.

### F. *ALL OTHER CLAIMS AGAINST KOEBEL*

■ The other claims the Complaint asserts against Koebel can not be decided on summary judgment. The first claim charges Koebel with fraud. Koebel argues that the claim of fraud can not survive summary judgment because Plaintiffs had full knowledge that Koebel worked as a sales representative on behalf of KDH. However, as explained above, this issue is in dispute between the Plaintiffs and Koebel and therefore must be decided by a jury at trial. Furthermore, the fact that Mossberg and Liu were aware of a certain relationship between USA Certified and KDH does not mean they also understood that Koebel was working as an independent sales representative for KDH or that USA Certified was not being compensated for facilities and services it may have been providing to KDH. This is particularly relevant in light of Koebel's testimony that although he informed Mossberg of his relationship with KDH, he never discussed whether commissions from his work as a sales representative for KDH would be part of the income for USA Certified. (*See* Koebel Dep. at 78.)

Koebel does not directly address the unjust enrichment, breach of fiduciary duty or breach of contract claims Plaintiffs assert against him. Rather, Koebel states generally that all claims should be dismissed. However, based on the issues of material fact delineated above, there are sufficient issues of material fact in dispute to require these claims to be tried. Furthermore, in light of the Court's holding, in particular with regard to the RICO claim under 18 U.S.C. § 1962(c) alleged against Koebel, Koebel's request for sanctions pursuant to Rule 11 of the Fed.R.Civ.P. based on the alleged patently improper assertion of RICO claims is denied.

### III. *ORDER*

For the reasons set for the above, it is hereby

**ORDERED** that the Complaint in this matter be dismissed in its entirety as against defendant Kentucky Derby Hosiery, Inc.; and it is further

**ORDERED** that the Complaint in this matter be dismissed in its entirety as against defendant Keith Coleman; and it is

**ORDERED** that the third claim, the fourth claim, the sixth claim, and the seventh claim in the Complaint are dismissed as against defendant Steve Koebel; and it is further

**ORDERED** that Koebel's request for Rule 11 sanctions against Plaintiffs is DENIED; and it is further

**ORDERED** that Plaintiffs' motion for partial summary judgment is DENIED; and it is finally

**ORDERED** that the remaining parties in this case, Plaintiffs and defendant Steve

Koebel, attend a pre-trial conference before the Court on May 30, 2003 at 11:15 a.m.

**SO ORDERED.**